1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   STEWART MANAGO,

11              Plaintiff,                    No. 2:07-cv-2290 LKK KJN P

12        vs.

13   BRAD WILLIAMS, et al.,                   AMENDED[1]

14              Defendants.                   FINDINGS AND RECOMMENDATIONS

15   _____/

16   I. INTRODUCTION

17              Plaintiff is a state prisoner, currently incarcerated at the California Correctional

18   Institution ("CCI"), in Tehachapi, California, under the authority of the California Department of

19   Corrections and Rehabilitation ("CDCR").  Plaintiff proceeds in forma pauperis and without

20   counsel[2] in this civil rights action filed pursuant to 42 U.S.C. § 1983.  This action proceeds on

21   _____

22        [1]  These findings and recommendations are amended solely for the purpose of correctly
     citing current Federal Rule of Civil Procedure 56, which was revised and rearranged effective
23   December 10, 2010.  As stated in the Advisory Committee Notes to the 2010 Amendments to
     Rule 56, "[t]he standard for granting summary judgment remains unchanged."  Accordingly, the
24   legal analyses set forth herein remain unchanged.

25        [2]  The court informed plaintiff that it would consider a request for appointment of counsel
     in this action.  (Dkt. No. 124.)  Plaintiff responded with a request that Los Angeles attorney Ollie
26   P. Manago be appointed as "advisory counsel," to assist plaintiff only with limited legal tasks.
     (Dkt. No. 152.)  The court denied plaintiff's request without prejudice, for the following reasons

1   plaintiff's First Amended Complaint ("FAC" or "complaint"), filed November 26, 2008 (Dkt.

2   No. 20), wherein plaintiff alleges that officials at CDCR's Office of Internal Affairs-Northern

3   Region ("OIA"), and California State Prison-Sacramento ("CSP-SAC"), improperly relied upon

4   plaintiff to investigate allegations of sexual misconduct by CSP-SAC Correctional Officer Mary

5   Brockett.  The investigation resulted in the termination of Brockett's CDCR employment.

6   Plaintiff contends that his participation in this "sting operation" compounded his serious mental

7   health needs, and that plaintiff was thereafter denied adequate mental health care, and subjected

8   to retaliatory actions by correctional staff.

9          Following this court's rulings on defendants' motions to dismiss (see Dkt. Nos.

10  78, 89), this action proceeds on the following claims, against the following defendants:  (1)

11  _____

    (Dkt. No. 155 at 2):

            Plaintiff's current request for appointment of a specific attorney, to
            act in a very limited capacity at the primary direction of plaintiff, is
            not the type of appointment authorized by this court.  While the
            court occasionally appoints attorneys for a limited purpose (e.g.,
            settlement or mediation), an attorney is not assigned to act in a
            legal-assistant capacity.  Moreover, while this court's review
            indicates that Ollie Manago is currently a member in good standing
            of the State Bar of California, and is admitted to practice in the
            United States District Court for the Eastern District of California,
            she has neither sought appointment to this court's Pro Bono Panel,
            nor filed a declaration in support of plaintiff's instant motion
            indicating her willingness to accept appointment on behalf of
            plaintiff.  The court emphasizes, however, that even if Ms. Manago
            fulfilled these matters, plaintiff's current request for appointment
            of "advisory counsel" falls outside the parameters authorizing
            appointment of counsel by this court.

    Plaintiff did not further pursue a request for appointment of counsel in this action.

            The court notes, parenthetically, that in 1990 the California Court of Appeal affirmed the
    trial court's denial of Manago's request to represent himself in the criminal trial that resulted in
    plaintiff's underlying convictions, on the ground that plaintiff appeared unqualified to present
    even a rudimentary defense.  See People v. Manago (1990) 220 Cal. App. 3d 982.  However, this
    ruling has since been abrogated by cases holding that the determination whether a defendant
    knowingly and intelligently waives his right to counsel generally depends on the defendant's
    understanding of the significance and consequences of his decision, rather than the defendant's
    ability to represent himself.  See, e.g., Godinez v. Moran, 509 U.S. 389, 399–400 (1993); People
    v. Taylor (2009) 47 Cal. 4th 850, 873- 91.

                                          2

1   Eighth Amendment claim for sexual misconduct, against defendant Mary Brockett; (2) Eighth

2   Amendment claims for deliberate indifference to plaintiff's serious mental health needs, against

3   defendants K. Kelly (CSP-SAC Chief Psychologist and Health Care Manager); M. Jaffe (CSP-

4   SAC Chief Psychiatrist); J. Martin (CSP-SAC Senior Supervising Psychologist); B. Williams

5   and J. Chapman (both agents with CDCR's OIA); S. Vance (CSP-SAC Correctional Captain),

6   and P. Kennedy (CSP-SAC Correctional Counselor);  (3) Eighth Amendment failure to protect

7   claims, against defendants Kelly, Jaffe, Martin, Vance, Williams, and Chapman; (4) First

8   Amendment retaliation claims, against defendants Williams; Chapman; Vance, Kennedy; R. Hill

9   (former CSP-SAC Associate Warden); S. Shannon (CSP-SAC Correctional Lieutenant); B.

10  Joseph and C. Gold (both CSP-SAC Correctional Sergeants); R. Garcia (Investigative Services

11  Unit Correctional Officer); and J. Tinseth, J. Wachter, and R. Morrow (all Correctional Officers);

12  and (5) "failure to supervise" claims, against defendants Kelly, Jaffe, Williams, Chapman, Hill,

13  Vance, Shannon, Joseph, and Gold.

14          Presently pending for decision are the motions for summary judgment filed,

15  respectively, by defendant Brockett (Dkt. No. 183-84), and all other defendants (Dkt. Nos. 164-

16  82.)[3]  Plaintiff timely opposed the motions, and also filed authorized supplemental oppositions,

17  surreplies and supporting exhibits (Dkt. Nos. 190-94, 197-98, 231, 250); defendants replied (Dkt.

18  Nos. 221-26, 251-52).  Defendants also submitted additional relevant evidence ordered by the

19  court.  (Dkt. Nos. 237-38, 246.)

20          For the reasons that follow, the court recommends summary judgment for

21  defendants on plaintiff's First Amendment retaliation claims, and summary judgment for

22  defendants on plaintiff's Eighth Amendment claims, with the exception of narrowed Eighth

23  Amendment claims, including certain failure to supervise claims addressed herein, against

24  _____

25      [3]  The motions for summary judgment were re-noticed, and supplemental briefing
    authorized, pursuant to the court's order informing plaintiff of the requirements for opposing a
    motion for summary judgment.  (See Dkt. No. 239.)  See Woods v. Carey, 684 F.3d 934 (9th Cir.
26  2012); Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc).

1  defendants Brockett, Kelly, Jaffe, Martin, Chapman, Vance and Kennedy, which the undersigned

2  finds should proceed to trial.

3  II.  LEGAL STANDARDS FOR SUMMARY JUDGMENT

4          Summary judgment is appropriate when it is demonstrated that the standard set

5  forth in Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if

6  the movant shows that there is no genuine dispute as to any material fact and the movant is

7  entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

8              Under summary judgment practice, the moving party always bears
               the initial responsibility of informing the district court of the basis
9              for its motion, and identifying those portions of "the pleadings,
               depositions, answers to interrogatories, and admissions on file,
10             together with the affidavits, if any," which it believes demonstrate
               the absence of a genuine issue of material fact.

11

12  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

13  56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need

14  only prove that there is an absence of evidence to support the non-moving party's case."  Nursing

15  Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

16  387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 Advisory

17  Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial

18  burden of production may rely on a showing that a party who does have the trial burden cannot

19  produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

20  should be entered, after adequate time for discovery and upon motion, against a party who fails to

21  make a showing sufficient to establish the existence of an element essential to that party's case,

22  and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.

23  "[A] complete failure of proof concerning an essential element of the nonmoving party's case

24  necessarily renders all other facts immaterial."  Id. at 323.

25          Consequently, if the moving party meets its initial responsibility, the burden then

26  shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.

1    See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting

2    to establish the existence of such a factual dispute, the opposing party may not rely upon the

3    allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

4    form of affidavits, and/or admissible discovery material in support of its contention that such a

5    dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

6    must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

7    of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

8    (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

9    1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

10   return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

11   1436 (9th Cir. 1987).

12           In the endeavor to establish the existence of a factual dispute, the opposing party

13   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

14   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

15   versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary

16   judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

17   genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

18   committee's note on 1963 amendments).

19           In resolving a summary judgment motion, the court examines the pleadings,

20   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

21   any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

22   477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

23   court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

24   Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

25   produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

26   Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

show that there is some metaphysical doubt as to the material facts. . . . Where the record taken

as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

III.  EVIDENTIARY OBJECTIONS

          The parties have raised numerous evidentiary objections.  For purposes of ruling

on the pending  motions for summary judgment, the court addresses only those objections to

evidence actually relied on by the court.  The court declines to address any remaining evidentiary

objections.[4]

IV.  FACTS

          The following summary sets forth the relevant facts that are undisputed by the

parties or, following the court's review of the evidence, have been deemed undisputed for

purposes of the pending motions.  Pertinent averments and disputed facts are also noted.

Previously-submitted evidence that cannot reasonably be disputed, e.g., copies of plaintiff's

relevant administrative appeals, are also noted.

          1.  Plaintiff was born on July 23, 1966, and is now 46 years of age.  Plaintiff

testified that he first received mental health treatment when he was about ten years old.

(Plaintiff's Deposition (Lodged pursuant to Dkt. No. 182) ("Pltf. Depo.") at 19, 21-2.)

          2.  Plaintiff was committed to CDCR in 1988, following convictions for

residential burglary, residential robbery and forcible rape.  (Nov. 10, 1988, Abstract of Judgment-

_____

     [4]  The court notes that there are thousands of pages of briefing and supporting evidence in
this case.  Moreover, plaintiff's submission of documents and/or the electronic filing of
plaintiff's documents, are not in chronological or substantive order, and do not adhere to the
sequence identified in plaintiff's list of 324 attached documents.  (See Dkt. No. 193 at 2-11.)
These challenges, coupled with defendants' apparent effort to provide a selectively-responsive
record, has required the court to rely on documents submitted by plaintiff but objected to by
defendants, for the reasons stated below.  The court further notes that, as a practical matter, it has
relied on the available transcripts of audio recordings submitted in this action, rather than the
actual audio recordings.

1    Commitment (Dkt. No. 184-2 at 4).)

2           3.  While incarcerated, plaintiff was convicted in 1993 of aggravated assault with

3    a deadly weapon and, in 1996, pled guilty to two counts of resisting an officer.  (Dkt. No. 184-2

4    at 2, 3.)

5           4.  In 1991, plaintiff was transferred from the Segregated Housing Unit ("SHU")

6    at California State Prison-Corcoran ("CSP-COR") to the SHU at Pelican Bay State Prison

7    ("PBSP").  Plaintiff was transferred from PBSP to CSP-SAC on June 1, 2000, where he

8    remained until January 21, 2004, when plaintiff was transferred to Salinas Valley State Prison

9    ("SVSP").  Plaintiff remained at SVSP until September 14, 2004, with the limited exception of

10   June 2, 2004, when he was returned to CSP-SAC to give testimony in the State Personnel Board

11   action against defendant Brockett.  From September 14, 2004, until April 6, 2005, plaintiff was

12   housed at High Desert State Prison ("HDSP").  Plaintiff was transferred back to CSP-SAC on

13   April 6, 2005, and remained there through commencement of this action on  October 26, 2007.

14   Plaintiff was transferred to the California Correctional Institution ("CCI") in October 2009,

15   where he remains incarcerated.

16          5.  In December 1995, in response to litigation on behalf of prisoners incarcerated

17   in segregated housing at Pelican Bay State Prison ("PBSP"), plaintiff was transferred from

18   PBSP's SHU to PBSP's "B Facility, to the psych service unit."[5]  (Pltf. Depo. at 36-7.)  Plaintiff

19   testified that his move was based on the March 21, 1994 finding of PBSP psychiatrist Dr.

20   Shepherd that plaintiff had an Axis I diagnosis of "Schizophrenia, paranoia 295.34, chronic with

21   ////

22

23          [5]  Plaintiff testified that he was moved from PBSP's SHU to its PSU, and then to CSP-
     SAC, because he is a member of the classes of prisoners represented in Madrid v. Gomez, 889 F.
24   Supp. 1146 (N. D. Cal. 1995) (class action of PBSP inmates holding, inter alia, that SHU
     placement of mentally ill prisoners constitutes cruel and unusual punishment); and Coleman v.
25   Wilson, 912 F. Supp. 1282, 1298 (E.D. Cal. 1995) (special master appointed to oversee
     development and implementation of plan to provide constitutionally adequate mental health care
26   to prisoners).  (See Pltf. Depo. at 12-4, 33-4, 36-7, 44, 136-37.)

1  acute exacerbation."[6]  (Id. at 39.)  Plaintiff testified that he was prescribed lithium and other

2  medications.  (Id. at 40-2.)

3         6.  Plaintiff testified that he was transferred to CSP-SAC in April 2000, at the

4  recommendation of his PBSP treating psychologist, Dr. Grimes, and staff psychiatrist, Dr.

5  Johnson, who "wanted me in a more stable environment," with the intent of reducing plaintiff's

6  flashbacks associated with Post-Traumatic Stress Disorder ("PTSD").  (Id. at 43.)  In January

7  2000, plaintiff "appeared before the [PBSP] institution committee for a mental health transfer.

8  . . . Dr. Grimes and the committee and the warden -- the associate warden . . . said that they had

9  contacted Karen Kelly, the [CSP-SAC] senior psychologist . . . and she agreed to accept me into

10 the PSU [Psychiatric Services Unit][7] program at California State Prison Sacramento."  (Id. at 44-

11 5; accord, Dkt. No. 193 at 13 ("[t]he Sr. Psychologist at SAC PSU has agreed to accept"

12 Manago).

13        7.  In a "Discharge Psychological Evaluation," dated April 19, 2000, prepared in

14 anticipation of plaintiff's transfer to CSP-SAC, PBSP psychologist William Grimes, Ph.D., noted

15 plaintiff's complex psychological diagnostic history, including present diagnoses of PTSD (Dkt.

16 No. 193 at 16):

17           [T]here has been considerable disagreement about the diagnosis of
             Mr. Manago's condition.  He has been given diagnoses of:
18           schizophrenia, paranoid; depression; bipolar disorder; cognitive
             disorder, NOS; and Axis II personality disorders with antisocial,
19           borderline, and narcissistic features. . . . [¶]  [B]oth the treating
             psychiatrist and this writer agree on posttraumatic stress disorder as
20           an Axis I diagnosis.  Dr. Johnson, however, favors schizoaffective
             disorder after PTSD, based on a history of mood disturbance and
21           the bizarre quality of his somatic delusion.  This writer, however,

22

23        [6]  The American Psychiatric Association has established a five-part Multiaxial
      Assessment for diagnosing mental disorders.  "Axis I" identifies "clinical disorders."  See
24    Diagnostic and Statistical Manual of Psychiatric Disorders ("DSM-IV"), at pp. 25-33.

25        [7]  "A PSU provides secure housing and care for inmates with diagnosed psychiatric
      disorders not requiring inpatient hospital care, but who require placement in housing equivalent
26    to Security Housing Unit (SHU), as described in subsection 3341.5(c), at the Enhanced
      Outpatient Program level of the mental health delivery system."  15 C.C.R. § 3341.5(b).

1    leans toward dissociative identity disorder ["DID"] as the second
     Axis I diagnosis.  DID is seen, dynamically, as a predictable
2    evolution of PTSD during development of psychological defenses.

3         8.  Dr. Grimes further noted, in concluding his April 2000 "Discharge

4    Psychological Evaluation," that plaintiff "is extremely suspicious of therapists, as well as others,

5    upon initial meeting, and it is strongly suggested that caution be taken to prevent the suspicion

6    and resistance before a good therapeutic relationship may develop."  (Dkt. No. 193 at 19.)

7         9.  Plaintiff was transferred to CSP-SAC on June 1, 2000.  (Pltf. Depo. at 38, 44-

8    5.)  In January 2001, plaintiff's SHU term was suspended and he was transferred to the Enhanced

9    Outpatient Program ("EOP") in Facility A.  (Id. at 45-7.)  Plaintiff testified that he was there

10   diagnosed with paranoid schizophrenia by his primary care physician, Dr. Windham; with PTSD

11   and schizophrenia by Dr. Gervin; and with schizoaffective disorder by his treating psychiatrist,

12   Dr. Frishman.  (Id. at 46-7.)

13        10.  In December 2003 and January 2004, plaintiff was housed in CSP-SAC's

14   EOP in Facility A, Building 4 (also known as "4 Block").  Plaintiff worked in 4 Block as a

15   housing unit porter, where he assisted unit correctional officers in passing out meals.  The job

16   required that plaintiff enter the dining room to retrieve the dinner trays, then take the trays to the

17   unit officers; pursuant to these tasks, plaintiff was generally subject to escort by correctional

18   staff.  (FAC at 5; Pltf. Depo. at 48, 151-52.)

19        11.  Defendant Mary Brockett worked as a CDCR correctional officer from

20   February 1994 until March 31, 2004.  In December 2003 and January 2004, Brockett worked as a

21   Facility Relief Officer on Second Watch, in the CSP-SAC Facility A, 4 Block, dining unit, on

22   Fridays and Saturdays.  (Brockett Decl. (Dkt. No. 184-3 at 2-4) at ¶¶ 2, 5.)

23        12.  Plaintiff and defendant Brockett dispute the nature and extent of their

24   interactions at all relevant times.  Brockett avers that, prior to January 10, 2004 (a Saturday), she

25   had "never had any extended conversations with Mr. Manago as he did not work for me as a

26   Porter."  (Id. at ¶ 6.)  Brockett avers that she "became aware of inmate Manago since he worked

9

1  as a Porter when I worked 4 Block on Saturdays, but I had little contact with him as he would be

2  working and subject to escort by other correctional officers." (Id.)

3      13.  Plaintiff alleges, in contrast, that Brockett began making sexual comments to

4  him during the summer 2003, primarily when he was on the yard, but also in the visiting and

5  laundry rooms, and when plaintiff was in his cell.[8] (Pltf. Depo. at 50-3, 142-51, 181.)  Plaintiff

6  alleges that he "first just brushed it off," and told Brockett that he was "involved with somebody

7  already." (Id. at 53-4.)

8      14.  Plaintiff avers that, on October 26, 2003, he "filed an ADA complaint"

9  requesting a transfer to California Medical Facility ("CMF"), because of Brockett's advances but

10  without mentioning her, because he "didn't want to be hit with no -- no type of sex charges." (Id.

11  at 54-5.)  A copy of plaintiff's ADA (CDC Form 1824) request (Log No. SAC-A-03-2413),[9]

12  indicates that plaintiff sought a transfer to the California Medical Facility ("CMF"), or California

13  Men's Colony ("CMC"), on the ground that he believed that his placement at CSP-SAC's EOP,

14  which included intermingling with the prison's Level IV general population ("GP") (including

---

16     [8] Plaintiff testified at his deposition that Brockett made numerous sexually inappropriate comments to him prior to December 2003, including the following (Pltf. Depo. at 51-3, 143-45):

17
18     • Plaintiff testified that Brockett said to him:  "I see you in the visit room all the time, and what's up with that?  Was that your girlfriend?"  "Well, I want to be your girlfriend."  "Well, she can't do nothing for you in here, right?"

19
20
21     • Plaintiff testified that Brockett "wanted to oral copulate me;" "she wanted to give me a blow job;" "[she] told me on numerous occasions that she wanted to suck my big, Black dick.  You know what I'm saying?  That I got a sexy body; that I got a cute ass.  She -- numerous times she tried to slap me on the ass.  Numerous times that she went in and tried to pull my dick out, right?  Told me I got a big dick, she's going to suck it."

22     [9] Defendants' objections to this and similar evidence (i.e. copies of administrative decisions and medical records submitted by plaintiff), are overruled.  Given defendants' failure to provide all of plaintiff's pertinent custodial, administrative and mental health records, the court is obliged to rely on plaintiff's evidence, particularly when these apparently official documents are consistent with the remainder of the record.  The undersigned declines to ignore such evidence at this stage of the litigation.  Documents that are not authenticated at summary judgment may nonetheless be admissible at trial.  See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003) (evidence which could be made admissible at trial may be considered on summary judgment); see also Aholelei v. Hawaii Dept. of Public Safety, 220 Fed. Appx. 670 (9th Cir. 2007).

1    special needs and protective custody inmates), placed him at higher risk of decompensation,

2    injury and charges of misconduct.[10]  ( Dkt. No. 190-4 at 41-9.)  Plaintiff sought "optimal

3    treatment" at another facility that would "assist in preventing petitioner from deteriorating on a

4    level IV GP yard.  And/or potentially self-destructive behaviors."  (Id. at 41.)

5            15.  Plaintiff's ADA request was reviewed by defendant P. Kennedy, Correctional

6    Counselor I, who interviewed plaintiff on November 13, 2003.  Kennedy noted plaintiff's request

7    to be transferred to a "yard or facility [in] which he can concentrate on his mental health issues

8    and not the politics or prison violence associated with level IV yards."  (Id. at 42.)  Nevertheless,

9    Kennedy noted plaintiff's success in his designated "MHLOC" (Mental Health Level of Care),

10   opined that plaintiff's mental health and security needs were being met at SCP-SAC's EOP unit,

11   then, despite plaintiff's protestations (see n.10, supra), dropped plaintiff's LOC to CCCMS,

12   noting that plaintiff "should be re-evaluated for appropriate placement."  (Id.)  Kennedy's

13   recommendations were approved by Associate Warden Stiles on November 19, 2003.  Kennedy

14   does not reference this matter in her declaration filed in this action.  (Dkt. No. 165-5 at 2-6.)

15           16.  Meanwhile, on July 14, 2003, CSP-SAC Investigative Captain R. Mandeville,

16   on behalf of CSP-SAC Chief Deputy Warden G. Stratton, submitted a request to the Office of

17   Internal Affairs-Northern Region (also known as the Internal Affairs Unit ("IAU")), to initiate an

18   investigation of defendant Brockett, based on evidence that Brockett may have been overfamiliar

19   with an inmate, and may have failed to notify superiors of similar misconduct by another female

20   correctional officer.  (Internal Affairs Investigation Report - Case No. SAC-249-03, Feb. 21,

21   2004 (Lodged under Seal on May 4, 2012, pursuant to Order filed April 9, 2012 (Dkt. No. 228),

22

23           [10]  Plaintiff noted, for example, that GP yards are prone to "fights, staff assaults, and/or
     stabbing[s]," which could trigger psychotic episodes by mentally ill patients who are unable to
     conform to protocol (e.g., down on the yard).  (Dkt. No. 190-4 at 43.)  Plaintiff also noted that

24   EOP inmates who are "dropped" to CCCMS (Correctional Clinical Case Management System)
     status, for purposes of integration with other inmate populations, are particularly at risk.  Plaintiff

25   explained that, when his own status was dropped to CCCMS in 1996, he "did alright for about 3
     months," but then received a Rules Violation Report ("RVR") for stabbing a correctional officer.

26   (Id.)

1  hereafter "Investigative Report," or "Report.").)  The request was addressed to CSP-SAC

2  Warden Cheryl Pliler, and Regional Special Agent-in-Charge Sandi Grout.  On July 15, 2003,

3  IAU Special Agent Erin Parker signed the request as the investigating employee.  (IAU Rpt. at

4  BR-1-Page # (hereafter "IAU Rpt.") at 13.)

5          17.  In a confidential memorandum dated December 17, 2003, Agent Grout

6  informed CSP-SAC Warden Mike Knowles that IAU-Northern Region had accepted the subject

7  complaint, and that case responsibility was assigned to Senior Special Agent James Rogers and

8  Agent Jill Chapman.  (Id. at 14.)

9          18.  The resulting Investigative Report, completed February 21, 2004, by Agent

10 Parker, was addressed to CDCR Director Richard A. Rimmer, and Office of Investigative

11 Services Assistant Director Martin H. Hoshino; the Report recounts the details of the Brockett

12 investigation.  (Id. at 15-134.)  The Report was signed by Agent Parker, Special Agent-in Charge

13 Grout, and Senior Special Agent Julie Mansfield, all agents at IAU-Northern Region.  (Id. at 48.)

14         19.  The Investigative Report notes that responsibility for the Brockett

15 investigation was assigned to Agent Chapman, defendant herein, on December 17, 2003.  The

16 case was re-assigned to Agent Parker on January 29, 2004.  (Id. at 16.)

17         20.  The Report recounts an initial meeting with plaintiff, by Investigative

18 Services Unit ("ISU") Correctional Officer R. Garcia, defendant herein, on December 11, 2003.

19 (Id. at 17.)  In a confidential memorandum addressed to CSP-SAC Chief Deputy Warden G.

20 Stratton, also dated December 11, 2003, Garcia stated that he had conducted a confidential

21 interview with plaintiff, together with ISU Officer R. Mendoza, at plaintiff's request.  Plaintiff

22 told Garcia and Mendoza that a "female A-Facility employee" had provided contraband to

23 inmates, including cell phones and a clothes iron.  (Id. at 53.)  The memorandum did not identify

24 the subject employee, and does not contain allegations of sexual misconduct.  However, the

25 interview was audio recorded and provided to ISU Lieutenant D. Leiber, "due to other allegations

26 ////

1   of staff misconduct made by Manago."[11]   (Id.)

2          21.  Defendant Garcia has filed a declaration herein, in which he states, in

3   pertinent part, that he served three years in CSP-SAC's ISU, from April 1999 to January 2004,

4   but that his December 11, 2003 interview of plaintiff, and resulting memorandum to Warden

5   Stratton, constitute his only involvement in this action.  (Garcia Decl., Dkt. No. 165-3 at 2-3.)

6   Although not included in his memorandum, Garcia concedes in his declaration that his interview

7   of plaintiff included "Manago's allegations against Mary Brockett."  (Id. at 3.)  However, Garcia

8   avers that he "had no specific information or involvement in any investigation [of Brockett] after

9   my interview with Manago and the report I drafted following my interview with him."  (Id.)

10         22.  In disavowals common to all of the correctional defendants in this action,

11  Garcia states that he knew who Brockett was, but did not have a personal relationship with her

12  (and hence, implicitly, had no motivation to cause Brockett harm or to retaliate against plaintiff

13  for participating in the investigation against Brockett); that he "had no authority to administer

14  medical or mental health services to Plaintiff Manago"; "never intentionally or deliberately

15  disregarded any known risk and/or serious injury" to plaintiff; "never intentionally or

16  deliberately" delayed or denied plaintiff "access to medical/mental health care and/or treatment";

17  never "intentionally or knowingly cause[d] Plaintiff any pain, suffering, injury or harm"; "never

18  at any time attempted to cause harm or incite or direct others to cause harm to inmate Stewart

19  Manago"; at no time referred to plaintiff as a "snitch"; never told anyone that it was "open

20  season" on plaintiff; and was never a member of any "Green Wall" (gang of prison staff

21  members sharing a code of silence).  (Dkt. No. 165-5 at 4.)  (The court notes that these

22  disavowals are common to all the correctional defendants.)

23

24         [11]  The Investigative Report provides that the following additional information was
    contained in the audio recording of Garcia's interview with plaintiff, again without identifying
    Brockett by name:  that plaintiff had known the "female CO" for about a year; that the CO

25  trusted plaintiff because her boyfriend said plaintiff was "cool;" that the CO told plaintiff she
    would have his baby if he paid $10,000 to have her tubes untied; and that the CO had provided

26  plaintiff with personal information and told him to watch his back.  (IAU Rpt. at 17-8.)

23.   Meanwhile, on December 10, 2003, the day before plaintiff met with defendant Garcia, plaintiff was forcibly extracted from his cell and placed in administrative segregation ("AdSeg").  In a staff complaint plaintiff later filed against defendant Vance, Facility A Correctional Captain, on December 14, 2003 (Log No. SAC-03-2823), plaintiff alleged as follows (Dkt. No. 35-1 at 15-7):

> This is a Citizens complaint pursuant to Penal Code Section 832.5, against Correctional Captain S. Vance, and other employees, who participated in the December 10, 2003, holding cell extraction of inmate/patient Manago.  It appears that Captain Vance used unlawful influence upon other (C.D.C.) employees to deny my request for suicidal intervention.  Prior to the extraction, Counselor Kennedy and Dr. Frishman informed me that I was accepted in (O.H.U.) [Outpatient Housing Unit].  I have been felling (sic) very paranoid and actively suicidal.  I told the extraction team members that if they place me in AdSeg, that I would hang myself.  It's all on video tape.  Custody staff still forced me to go into 6-Block Housing Unit.  Only after I started to protect their Misconduct I was removed from the cell.  I have evidence that Captain Vance and other Staff were irresponsible and have engaged in unethical misconduct which reflect discredit on themselves.

24.   On December 14, 2003, plaintiff was transferred from CSP-SAC's EOP unit to the institution's Correctional Treatment Center ("CTC"), for suicide precautions.[12] (Exh. N to Kelly Decl., Dkt. No. 166-1 at 3; see also Dkt. No. 166-2 at 6.)

25.   On December 17, 2003, pursuant to the OIA's Brockett investigation, plaintiff was interviewed by defendant Chapman, OIA Agent.  Plaintiff told defendant Chapman, in pertinent part, that Brockett "started getting attached to him" after her boyfriend, inmate Johnson, was transferred to another institution, and that Brockett told plaintiff that she wanted to have sexual relations with him.  Plaintiff stated that, two or three weeks before, Brockett told

---

[12]  According to CDCR's own Mental Health Policies, an inmate may be placed for emergency short-term treatment in a "Mental Health Crisis Bed Placement ('MHCBP')," which may be at an institution's "Correctional Treatment Center ('CTC')," that "offer[s] 24-hour basic medical, nursing, and other health services."  IMSP&P Manual (Mental Health Services), at 12-1-8 to 9.  "The MHCB . . . provides short-term inpatient care for seriously mentally disordered inmate-patients awaiting transfer to a hospital program or being stabilized on medication prior to transfer to a less restrictive level of care" within the institution.  (Id. at 12-1-8.)

1 plaintiff that she would have his child if he gave her $10,000 to get her tubes untied.  Chapman

2 asked plaintiff if he thought that Brockett would "take a letter out for him"; plaintiff responded in

3 the affirmative.  (IAU Rpt. at 18-9; see also Pltf. Depo. at 69-71.)

4      26.  On December 18, 2003, plaintiff was discharged from the CTC, and

5 readmitted to the EOP unit.  (Dkt. No. 166 at 15.)  The treatment notes, signed by Dr. Paizis,

6 indicate that plaintiff's discharge prescriptions included Zyprexa (antipsychotic medication), and

7 Lithium (mood stabilizing medication).  (Id.)  Also on December 18, 2003, CSP-SAC Warden

8 Knowles partially granted plaintiff's staff complaint against defendant Vance (Log No. SAC

9 03-02823), at the second level review (informal and formal level reviews were bypassed), based

10 on the referral of plaintiff's complaint for investigation.  (Dkt. No. 35-1 at 16, 18, 20.)

11      27.  Plaintiff testified that he had no physical contact with Brockett prior to

12 December 20, 2003.  (Pltf. Depo. at 155-56; 158.)  Plaintiff told Chapman, and later testified,

13 that, on December 20, 2003, Brockett gave plaintiff a French kiss and a personal handwritten

14 note, and "couldn't keep her hands off of him."  (Id. at 76-7; IAU Rpt. at 20.)

15      28.  Plaintiff told Chapman, and later testified (but with less clarity regarding the

16 date), that he engaged in sexual touching with Brockett on January 3, 2004, which allegedly

17 included Brockett touching plaintiff's genitals, then plaintiff touching Brockett's breasts through

18 her clothing.  (IAU Rpt. at 20; Pltf. Depo. at 158, 165-67, 176.)  Chapman noted, on January 7,

19 2004, that plaintiff "was 100 percent certain he could get her [Brockett] to do anything he wanted

20 her to do . . . Manago sounded very confident that 'everything' could be captured on audio and

21 video camera."  (IAU Rpt. at 20-1.)

22      29.  On January 9, 2004, Chapman informed plaintiff of the IAU "operation plan,"

23 which would include plaintiff's participation in the Brockett investigation.  Plaintiff agreed, in

24 pertinent part, to write a letter to his putative brother, addressed to an undercover post office box

25 address, and ask Brockett to mail it out, circumventing institutional mail procedures.  Chapman's

26 written summary of this meeting concludes that "Manago acknowledged Agent Chapman made

no promises to him in return for his cooperation." (IAU Rpt. at 22.)

30. Plaintiff reported to Chapman that, on January 10, 2004, he gave Brockett the letter and asked her to mail it; and that Brockett reportedly placed the letter in her inside jacket pocket. (Id. at 22-3.) Brockett later averred that, when plaintiff asked her to mail the letter, she refused, but plaintiff left the letter in the office; when Brockett later noticed the letter, she "picked it up and put it in my coat pocket and forgot about it and accidentally took the letter home." (Brockett Decl. at ¶ 7.)

31. On January 16, 2004, Chapman supplied plaintiff with a voice recorder, for the purpose of surreptitiously recording his interactions with Brockett on January 17, 2004.[13]

32. Brockett returned the subject letter to plaintiff during their recorded interactions on January 17, 2004. Brockett avers that, when she returned the letter to plaintiff and told him that he needed to mail it through the Housing Unit Officer, plaintiff became upset and angry, so she "engaged him in conversation in an attempt to diffuse any inmate who was beginning to show some hostility toward me." (Brockett Decl. at ¶¶ 8-9.) Brockett explains that she had "previously . . . been assaulted in the same dining hall by an inmate," and "[t]hat incident came to mind as Mr. Manago, who suddenly appeared in the dining hall without escort, retrieved his letter." (Id.)

////

---

[13] Authorization for plaintiff to wear the recording device was granted by the Sacramento County District Attorney's Office, Prison Prosecution Unit, on January 14, 2004; CSP-SAC Warden Mike Knowles was informed of the plan on January 15, 2004. Plaintiff recorded his interactions with Brockett on January 17, 2004. On January 22, 2004, the subject recording was sent to the Department of Justice for enhancement; the recording was copied onto CDs and provided to Chapman on January 28, 2004. On January 29, 2004, plaintiff listened to the recording with Chapman, who subsequently prepared a transcript which includes plaintiff's parenthetical descriptions of his interactions with Brockett on January 17, 2004. This transcript was provided to the court under seal, as an attachment to the IAU Investigative Report. (IAU Rpt. at 22, 57-9; Jan. 17, 2004 Transcript at id. 64-110.)

Although not supported by the current record, plaintiff testified that he wore a recording device for three or four weeks, but that apparently only his January 17, 2004 interactions were transcribed (Pltf. Depo. at 179, 182), and that there was a video recording of Brockett orally copulating plaintiff (id. at 180).

16

1          33.   Brockett denies any sexual contact with plaintiff at any time, and avers that

2  she responded to plaintiff's sexual innuendos on January 17, 2003, "in order to keep the peace."

3  (Id. at ¶ 10.)  Brockett describes the following interactions with plaintiff on January 17, 2004

4  (id.):

> Mr. Manago would come into my office, engage me in
> conversation and then later return to engage me in more
> conversation [in] which he initiated sexual comments which I
> attempted to deflect.  For example, he asked when was the first
> time I had oral sex.  He began calling me "babe" or "baby."  He
> stated, "You are all the woman [he] [I] need" and that he [would]
> "make love to [me] real good."  He also said that he had thought
> about kissing me.  In fact, during the several times Mr. Manago
> would return to my office on the 17th he would make several
> comments of a sexual nature.  I did not know at the time that Mr.
> Manago voluntarily agreed with CDCR Internal Affairs to initiate
> contact with me and induce me in making over familiar statements
> to Mr. Manago.  In hindsight that explains the strange interactions
> Mr. Manago was having with me that day.

13          34.   Plaintiff told Chapman and testified that, on January 17, 2004, Brockett

14  kissed plaintiff, touched his genitals and orally copulated him.  (IAU Rpt. at 24-5; Pltf. Depo. at

15  159-67; 182-3.)  Plaintiff's allegations are not inconsistent with the transcript of plaintiff's

16  January 17, 2004 interactions with Brockett; but neither does the transcript prove plaintiff's

17  allegations.  Plaintiff testified that some of his recorded statements reflect his attempt to describe

18  Brockett's actions rather than to solicit such conduct, e.g., saying "Why you infatuated with my

19  butt?" after Brockett allegedly slapped it.  Plaintiff explained that "because it was a part of the

20  investigation, I said whatever internal affairs needed to hear to prove my allegations, to prove

21  that I wasn't lying or deceiving them."  (Pltf. Depo. at 161-62; see generally id. at 160-65.)

22          35.   Plaintiff testified that he continued to participate in the investigation of

23  Brockett at Chapman's urging.  He stated that, "at the end of December," he asked Chapman to

24  terminate the investigation before his relationship with Brockett became too "personal," or

25  ////

26  ////

17

plaintiff felt it necessary to demonstrate to Brockett that he wasn't gay.[14]  (Id. at 76-82, 154-55,

170-71.)  Chapman allegedly responded that the investigation "needed to go on" (id. at 77), and

that plaintiff should try to "get what you can get.  Work her, work her, work her."  (Id. at 80.)

Plaintiff testified that, when he "looked at like what Jill Chapman was telling me I started to feel

uncomfortable because I looked at she was telling me to compromise me," but Chapman

reportedly responded, "[r]egardless, just get what you can get."  (Id. at 80-1.)  Plaintiff stated,

that "[o]n the 28th or the 24th, when she [Chapman] initiated that visit that week, I believe that

she had way more than enough, and there was no sexual misconduct, other than her [Brockett's]

sexual harassment kind of stuff talking like and trying to touch, but it wasn't to the point where it

got actual physical.  It was like she [Chapman] wanted it to go on and on and on and on.  You

know what I'm saying? . . . I'm talking about actually her [Brockett] oral copulating and all that,

it didn't get that far yet [prior to December 28, 2003]."  (Id. at 81.)   Plaintiff testified that the

investigators wanted to hear evidence of sexual activity on tape, that, "because it was a sexual

misconduct allegation against her [Brockett] . . . Jill Chapman wanted to see how far it was going

to go."  (Id. at 75, 164.)  In contrast, plaintiff testified that, before he was involved in the

Brockett investigation, he "ke[pt] moving it where she can't touch me."  (Id. at 157.)

    36.  Plaintiff testified that he engaged in sexual activity with Brockett solely for

purposes of the investigation, explaining as follows:

> Did I have any intent to make your client feel good?  Absolutely
> not, because if I wanted to make her feel good I would have been
> doing it.  I would have told ya'll nothing.  I would have just kept
> her as my prize, but she wasn't my prize.  I reported her
> misconduct.  That's all it was.  (Id. at 164-65.)
>
> I was so fed up with your client, right?  It was nothing sexual.  Like
> I said in the 602, I didn't enjoy nothing that your client did.  I

---

[14]  Plaintiff testified that, when Brockett suggested that plaintiff may be gay "I got to the point, to be honest with you, I said, 'Yeah.  I'm going to stick my dick in her mouth and let her know that I'm not gay, period."  (Pltf. Depo. at 170; see also id. at 171 ("she try to make you feel like you less than a man, talking about 'Oh, you gay.  You gay.'  No, I'm not gay.  Okay?  So I prove my case to show that your client is a predator.")

1          didn't even like your client." (Id. at 171.)

2          I was busy working as a special agent for CDC to prove that your
           client was engaging in sexual misconduct and that's what I was
3          doing. (Id. at 172.)

4          I didn't set her up.  I didn't like her sexual advances.  If I did, I
           wouldn't have told ya'll about it.  We wouldn't even be here today.
5          (Id. at 173.)

6          37.  Defendant Chapman avers that plaintiff "was willing to assist in the

7    investigation," and that Chapman never told him "to engage in sexual relations with Officer

8    Brockett," or that "he would be written up if he refused to continue to cooperate with the

9    investigation." (Chapman Decl., Dkt. No. 165-2 at 3.)

10         38.  Brockett was terminated from employment with CDCR on March 31, 2004,

11   as a result of the subject IAU investigation. (Chapman Decl. at 3; Brockett Decl. at ¶¶ 2, 3.)

12   The Notice of Adverse Action sustained allegations that Brockett participated in an overly

13   familiar relationship with plaintiff, based on their recorded verbal exchanges involving personal

14   and sexual topics; failed to comply with established policy and procedure when plaintiff asked

15   her to mail a letter for him; and been dishonest in her investigative interview.  Although

16   Brockett's dismissal was not based on findings that Brockett had engaged in sexual relations with

17   plaintiff, plaintiff was noted to be a "reliable informant." (IAU Rpt. at 2-7.)

18         39.  Brockett appealed her dismissal to the California State Personnel Board.

19   Pursuant to hearings convened May 2, 2007, January 24, 2008, and February 25, 2008, which

20   included testimony by Brockett, Manago and Chapman, the dismissal was sustained on

21   November 11, 2008. (Documents Lodged Under Seal (Dkt. Nos. 237-38, 246).)  The Board's

22   findings of fact include Brockett's failure to sound an alarm when plaintiff's conduct was overtly

23   sexual, but did not include a finding that Brockett engaged in sexual relations with plaintiff.

24   (Dkt. No. 246-3 at 4.)

25         40.  Brockett was at no time criminally prosecuted for violation of California

26   Penal Code § 289.6 (making it a public offense for an employee of a state prison to engage in

sexual activity with a confined, albeit consenting, adult).  (Brockett Decl. at ¶ 11.)

41.  On January 21, 2004, plaintiff was transferred from CSP-SAC to SVSP's EOP unit, where he remained until September 14, 2004, with the limited exception of returning to CSP-SAC on June 2, 2004 to testify before the State Personnel Board.  In an administrative grievance filed on May 11, 2004 (Log No. SAC 04-0946), plaintiff alleged that he had been "the victim of Sexual Harassment and Sexual Assault" by Brockett and that, despite his transfer from PBSP to the CSP-SAC EOP program "for therapeutic reasons," where his "psychiatric symptoms [had] stabilized," he had been transferred to SVSP in retaliation for his participation in the Brockett investigation.  (Dkt. No. 35-1 at 23, 27.)  Plaintiff also alleged that, in February 2004, he had been approached by inmate Brian Hackett, who gave plaintiff a message from defendants Vance and Kennedy that, if plaintiff testified against Brockett, "[t]hey gonna send somebody to kill you or you kill them either way you'd never see day light or the streets again."  (Id. at 29.) This grievance was reviewed, in pertinent part, by defendant B. Williams, then OAI-Northern Region Acting Special Agent in Charge, who denied the appeal, with the exception of ordering further review of plaintiff's retaliation claims.  (Dkt. No. 35-1 at 26; Williams Decl. at 2-3.) Further findings supporting a denial of plaintiff's retaliation claims were issued separately by Williams and defendant Joseph in October 2005.  (See Dkt. No. 193-4 at 22; Dkt. No. 165-8 at 7-8, 13-4.)

42.  On July 2, 2004, while at SVSP, plaintiff was charged with conspiracy to assault staff and placed in AdSeg.  (Dkt. No. 194-1 at 1.)  The charges were later dismissed.  (Id. at 14.)  Plaintiff was placed in SVSP's Modified Program from August to September 2004.  (Dkt. No. 193-4 at 16-17.)

43.  On August 19, 2004, plaintiff sent the following letter to defendant Chapman, with a copy sent to the Prison Law Office (Dkt. No. 193-4 at 20-1):

> Dear Ms. Chapman,
>
> I am writing to you concerning my present housing situation.  On

the above-stated date I was released from ASU based on . . . false charges dated June 16, 2004 and July 2, 2004 . . . of conspiracy to assault staff at SVSP . . . I was found not guilty of these false charges.  You promised me that I was not going to be retaliated against if I testifyed (sic) against Officer Mary Brockett.  It should be noted that, after I provided testimony against Officer Brockett, on June 2, 2004, against some prison official['] wishes, you failed to protect me as promised by (OIA).  You said that after I provided testimony that CDC-Prison Officials had my back, and you told Dionne the same thing.  Now after I was relieved from ASH (ICC) refused to allow me to return to (EOP) for my much need[ed] mental health treatment.  I'm currently housed on "D" Facility pending transfer to High Desert State Prison.  You said that I would be transferred to (CMF) to assure me that I would not be subjected to retaliation.  Lt. Middlebrooks had Dr. Scramozzino to drop my level of care, in order to be transfer[red] to (CMF), due to alleged enemy in (EOP) at (CMF).  I do believe that prison officials are attempting to endanger my life, by transferring me to a prison where there [are] no (EOP) to treat me for my (PTSD) and other disorders.  There was a Warden to Warden agreement to officially transfer me to (CMF) as a (CCCMS) main line until the alleged enemy was transfer[red] to another [].  Please call (Dionne) and let her know what's going on with my transfer to (CMF).  So that she will let me know at visiting.  [¶ ] Thank you very much. [¶]  Respectfully submitted . . . .

44.  On September 14, 2004, plaintiff was transferred to HDSP.

45.  On October 13, 2004, plaintiff filed an administrative grievance (Log No. SVSP-04-2845) alleging, in pertinent part, that his transfer to HDSP had been retaliatory on the part of SVSP staff; that the precipitating RVR at SVSP had since been dismissed; and that, at HDSP, plaintiff was being "denied all mental health treatment."  (Dkt. No. 193-4 at 14.)  As a result, plaintiff asserted, "I have been having mental health problems.  The voices tell me to do crazy things." (Id. at 8, 12.)

46.  In October 2004 and February 2005, staff with the Prison Law Office ("PLO") (legal representatives of the plaintiff class of inmates in Coleman v. Wilson, supra, 912 F. Supp. 1282) sent to CDCR's "Coleman Project Team" the following letters on plaintiff's behalf:

a.  In an October 28, 2004 letter to the "Coleman Project Team, Health Care Services Division," regarding "Urgent Mental Health Concern (Stewart Manago, E-02564),"

PLO staff attorney Keith Wattley stated (Dkt. No. 193-4 at 18):

> We have been corresponding with the above-referenced High
> Desert prisoner.  Mr. Manago has a lengthy record of mental health
> treatment and spent years in the EOP and PSU at Pelican Bay,
> CSP-Sacramento and Salinas Valley.  He was recently removed
> from the EOP to CCCMS while at Salinas Valley.  He was
> subsequently transferred to High Desert's C facility, which has
> been on lockdown for 15 months.  Since being housed at High
> Desert Mr. Manago has been experiencing ongoing racial tension
> and is not taking prescribed medications because he wants to be
> prepared to defend himself.  He reports increased voices and other
> symptoms.
>
> Plaintiffs remain very concerned about the impact of lengthy
> lockdowns on mental health programs.  This patient is obviously
> decompensating and must be immediately transferred to a facility
> with the appropriate EOP level of care.

b. In a February 16, 2005 letter to the "Coleman Project Team, Health Care

Services Division," regarding "Urgent Mental Health Concern (Stewart Manago, E-02564),"

Della Burke, Litigation Assistant to PLO staff Keith Wattley, wrote (Dkt. No. 193-4 at 19):

> We continue to be concerned about the treatment of the above-
> referenced High Desert prisoner.  As we previously informed you,
> Mr. Manago has a lengthy record of mental health treatment and
> spent years in the EOP and PSU at Pelican Bay, CSP-Sacramento
> and Salinas Valley.  He was recently removed from the EOP to
> CCCMS while at Salinas Valley.  He was subsequently transferred
> to High Desert's C facility, which has been on extended lockdowns
> over the last couple years.  Since being housed at High Desert Mr.
> Manago has been experiencing tensions, and he stopped taking
> prescribed medications.  He started reporting increased voices and
> several other symptoms.
>
> Mr. Manago now informs us that he was sent to the CTC at the end
> of January and placed in five-point restraints.  He states that he has
> now been placed in administrative segregation, although he does
> not explain why.[15]
>
> Plaintiffs asked that Mr. Manago be immediately transferred to a
> facility with the appropriate EOP level of care in our October 28,

---

[15] On January 13, 2005, plaintiff was placed into administrative segregation at HDSP for conspiring to assault staff.  Plaintiff was found guilty in a decision reached on March 2, 2005. (Dkt. No. 194-1 at 2, 15, 17, 29.)  Plaintiff's challenge to this finding (Log Nos. SAC-05-2099 and HDSP 05-3434), was rejected at the Director's Level Review on February 2, 2007.  (Id. at 1-3.)

2004 letter.  Please response (sic) and inform us if he has been endorsed for transfer and to what facility he will be transferred.

47.  On April 6, 2005, plaintiff was transferred from HDSP to CSP-SAC, based on his "alleged mental health needs;" plaintiff was endorsed for the "EOP/ASU HUB" due to the pending RVR against him for conspiracy to assault staff (see n.15, supra), with instructions to be seen by the Institutional Classification Committee ("ICC") within 10 days.  (Dkt. No. 194-1 at 2,16.)

48.  On March 26, 2006, plaintiff filed an administrative grievance (Log No. SAC 06-0783), requesting that CSP-SAC prison officials and mental health staff transfer plaintiff to Atascadero State Hospital ("ASH"), for "optimal [mental health] treatment," based on plaintiff's allegations that he had been diagnosed with "a post-traumatic stress disorder amongst other disorders."  (Dkt. No. 35-2 at 4, 6.)  Plaintiff explained that he had been the victim of sexual assault by CO Brockett while housed at CSP-SAC, and that his cooperation in the Brockett investigation had resulted in acts of "retaliation and retribution" by mental health and correctional staff, including false rule violations and illegal placement in administrative segregation.  (Id.)  As a result, plaintiff explained, he was "continuing to experience" symptoms of stress, anxiety, depression, paranoia, nightmares, vomiting, rage, flashbacks and hearing voices.  (Id. at 6.)  Plaintiff's grievance was reviewed, in pertinent part, by defendants J. Martin (CSP-SAC Senior Supervising Psychologist), M. Jaffe (CSP-SAC Chief Psychiatrist), and K. Kelly (CSP-SAC Chief Psychologist and Health Care Manager), and denied at the Director's Level on September 18, 2006.

49.  On June 12, 2006, plaintiff filed another administrative grievance (Log No. SAC 06-01729), alleging perjury, "fraud and falsication (sic) of official state records," by "M. Jaffe, M.D., Chief Psychiatrist, R. Kelly, Ph.D., Health Care Manager, and J. Martin, Ph.D., Senior Psychologist at CSP-Sacramento."  (Dkt. No. 35-2 at 23.)  Plaintiff challenged the findings of these officials, when they reviewed plaintiff's prior grievance (Log No. SAC 06-

00783), that plaintiff did not have PTSD; plaintiff also challenged these defendants' refusal to address plaintiff's claims of stress and anxiety due to his alleged sexual abuse by Brockett and the retaliation of staff against plaintiff for his participation in the Brockett investigation.  (Id. at 30.)  This appeal was denied at the Director's Level on February 6, 2007.

50.  On October 15, 2006, plaintiff filed another administrative grievance (Log No. SAC 06-02306), wherein he alleged that defendants Captain S. Vance, Lieutenant S. Shannon, Sergeant B. Joseph, and Correctional Officers R. Garcia, J. Tinseth, J. Wachter, R. Morrow spread rumors that plaintiff was a "snitch" for reporting Brockett's alleged misconduct, rendering it "open season" against plaintiff; that defendants were "conspiring or inciting other inmates to assault appellant, . . .working hand to hand in order to have additional false confidential information placed in appellant's C-file, . . . as a flavor (sic) for Captain S. Vance and other corrupted staff on 'A' Facility."  (Dkt. No. 35-3 at 4-6.)  Plaintiff requested that an unbiased investigation into these allegations be conducted by the OIA, and that plaintiff be awarded one million dollars as "relief for retaliation."  (Id. at 4.)  The Director's Level Decision, issued April 12, 2007, granted in part plaintiff's appeal, on the ground that the underlying investigation into plaintiff's allegations had been inadequate, and ordered that a new inquiry be conducted.  (Id. at 2.)

51.  On October 23, 2006, plaintiff filed another administrative grievance (Log No. SAC 06-0264), alleging that he was not receiving adequate mental health treatment at CSP-SAC.  Plaintiff repeated his alleged interactions with Brockett and his allegations of staff retaliation for plaintiff's participation in the Brockett investigation.  (Dkt. No. 35-3 at 13, 15.) Plaintiff stated that he had symptoms of PTSD, stress, anxiety, hearing unwanted voices, feeling depressed and paranoid, having flashbacks of the alleged sexual abuse, nightmares, vomiting, and rage; plaintiff also stated that he was unable to confide in the CSP-SAC mental health staff. Plaintiff "respectfully request[ed] a transfer to the intermediate care facility at Vacaville [CMF] or Atascadero State Hospital for Mental Health Treatment."  (Id. at 13.)  This appeal was denied

1    at the Director's Level on June 11, 2007.  (Id. at 12.)

2           52.  Additional facts are set forth below, as pertinent to plaintiff's claims in light

3    of the pending motions for summary judgment.

4    V.  DISCUSSION

5           A.  Eighth Amendment Sexual Misconduct Claim Against Defendant Brockett

6           Defendant Brockett moves for summary judgment on plaintiff's only claim

7    against her.  In his First Cause of Action, plaintiff alleges that defendant Brockett engaged in

8    "[t]he unjustified and penologically unnecessary Use of Excessive Force upon plaintiff . . . in

9    December 2003, through January 2004, [and thereby] violated his rights under the Eighth

10   Amendment to the United States Constitution in that it constituted Cruel and Unusual

11   Punishment."  (FAC at 18.)  As found by this court in denying Brockett's motion to dismiss this

12   claim, "[p]laintiff's explicit statements of Brockett's alleged sexual conduct toward plaintiff

13   support his claim under the Eighth Amendment's ban against cruel and unusual punishment."

14   (Dkt. No. 78 at 13 n.11 (internal citation omitted).)

15          Despite her disavowal of any sexual conduct with plaintiff, Brockett's principal

16   argument in support of her motion for summary judgment is that, because plaintiff allegedly

17   "voluntarily and willfully consented to the alleged sexual encounters, and in fact initiated them,"

18   the evidence fails to establish that Brockett's alleged conduct was "objectively, sufficiently

19   serious," or that Brockett "acted with a sufficiently culpable state of mind to cause Mr. Manago

20   harm."  (Dkt. No. 183 at 2.)  Brockett also contends that any evidence she made sexually

21   inappropriate comments to plaintiff fails to state an Eighth Amendment claim.  (Id.)

22          1.  Legal Standards for Excessive Force/Sexual Misconduct Claim

23          The legal standards for sustaining an inmate's Eighth Amendment claim for cruel

24   and unusual punishment, premised on alleged sexual misconduct by a correctional officer, are as

25   follows:

26   ////

1

2

3

> The Eighth Amendment prohibits cruel and unusual punishment in penal institutions.  Whether a specific act constitutes cruel and unusual punishment is measured by "the evolving standards of decency that mark the progress of a maturing society."  Hudson v. McMillian, 503 U.S. 1, 8 (1992).

4

5

6

7

8

9

10

> Sexual harassment or abuse of an inmate by a corrections officer is a violation of the Eighth Amendment.  See Schwenk v. Hartford, 204 F.3d 1187, 1197 (9th Cir. 2000) ("In the simplest and most absolute of terms ... prisoners [have a clearly established Eighth Amendment right] to be free from sexual abuse. . . ."); see also Women Prisoners of the Dist. of Columbia Dep't of Corr. v. District of Columbia, 877 F. Supp. 634, 665 (D.D.C. 1994) ("[U]nsolicited touching of ... prisoners' [genitalia] by prison employees are 'simply not part of the penalty that criminal offenders pay for their offenses against society'" (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994))), aff'd in part and vacated in part, 93 F.3d 910 (D.C. Cir. 1996).

11

12

> In evaluating a prisoner's claim, courts consider whether "the officials act[ed] with a sufficiently culpable state of mind" and if the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation.  Hudson, 503 U.S. at 8.

13   Wood v. Beauclair, 692 F.3d 1041, 1045-46 (9th Cir. 2012).

14   In Wood, the Ninth Circuit Court of Appeals addressed, as a matter of first

15   impression in this circuit, whether a prisoner can state a cognizable Eighth Amendment claim

16   against a correctional officer for sexual conduct in which the prisoner voluntarily participated.

17   The Court of Appeals noted a conflict in the circuit courts on this question.  Some circuit courts

18   have held that a consensual sexual relationship between an inmate and a correctional officer,

19   where the "interactions were welcome and voluntary," fails to state an Eighth Amendment claim.

20   Id. at 1048, citing Freitas v. Ault, 109 F.3d 1335, 1338 (8th Cir.1997); also citing Hall v. Beavin,

21   202 F.3d 268, 1999 WL 1045694, at *1 (6th Cir. 1999); Fisher v. Goord, 981 F. Supp. 140, 174

22   (W.D.N.Y. 1997).  Other circuit courts have found that a prisoner is incapable of consenting to

23   an intimate relationship with a correctional officer, because of the underlying power disparity in

24   the relationship.  Wood, 692 F.3d at 1046-47, citing, inter alia, Lobozzo v. Colorado Dep't of

25   Corr., 429 Fed. Appx. 707, 711 (10th Cir. 2011); Carrigan v. Davis, 70 F. Supp. 2d 448 (D. Del.

26   1999); Cash v. County of Erie, 2009 WL 3199558 at *2 (W.D.N.Y. 2009).

1    Noting that the inherent "power dynamics between prisoners and guards make it

2 difficult to discern consent from coercion," id. at 1047, yet rejecting "a per se rule that would

3 make prisoners incapable of legally consenting to sexual relationships with prison officials," id.

4 at 1048, the Ninth Circuit concluded that the "better approach" requires application of a

5 rebuttable presumption that the challenged conduct was not consensual, id. at 1049.  As

6 described in Wood, this approach requires that the district court make the following analysis:

7           [W]hen a prisoner alleges sexual abuse by a prison guard, we
             believe the prisoner is entitled to a presumption that the conduct
8           was not consensual.  The state then may rebut this presumption by
             showing that the conduct involved no coercive factors.  We need
9           not attempt to exhaustively describe every factor which could be
             fairly characterized as coercive.  Of course, explicit assertions or
10          manifestations of non-consent indicate coercion, but so too may
             favors, privileges, or any type of exchange for sex.  Unless the state
11          carries its burden, the prisoner is deemed to have established the
             fact of non-consent.

12

13 Wood, 692 F.3d at 1049.

14    In contrast, inmate claims premised only on alleged verbal sexual harassment are

15 generally found to be noncognizable.  "Although the Ninth Circuit has recognized that sexual

16 harassment may constitute a cognizable claim for an Eighth Amendment violation, the Court has

17 specifically differentiated between sexual harassment that involves verbal abuse and that which

18 involves allegations of physical assault, finding [only] the later to be in violation of the

19 constitution."  Minifield v. Butikofer, 298 F. Supp. 2d 900, 904 (N.D. Cal. 2004), citing

20 Schwenk, supra, 204 F.3d at 1198.  "[T]he Eighth Amendment's protections do not necessarily

21 extend to mere verbal sexual harassment."  Austin v. Terhune, 367 F.3d 1167, 1172 (9th Cir.

22 2004), citing Blueford v. Prunty, 108 F.3d 251, 254-55 (9th Cir. 1997) (prison guard who

23 allegedly engaged in "vulgar same-sex trash talk" with inmates entitled to qualified immunity);

24 and Somers v. Thurman, 109 F.3d 614, 624 (9th Cir. 1997) (female correctional officers who

25 allegedly made improper statements about plaintiff while he showered entitled to qualified

26 immunity).

1          2. <u>Analysis</u>

2          Plaintiff and defendant Brockett dispute nearly all material facts concerning

3   Brockett's allegedly sexually harassing statements to plaintiff, which allegedly occurred from

4   summer 2003 through January 17, 2004, and Brockett's alleged sexual misconduct toward

5   plaintiff, which allegedly occurred in December 2003 and January 2004.  Moreover, most of the

6   evidence on these matters that is currently before the court was submitted under seal and remains

7   confidential.  In any case, even prior findings of fact in the underlying administrative proceedings

8   are not dispositive in the instant action -- it is reasonable to infer that a trier of fact in this federal

9   civil rights action may, based on the same evidence, make different factual findings than those

10  reached by CDCR's investigators and the State Personnel Board, each of which had the limited

11  goal of assessing Brockett's suitability for continued employment with CDCR.

12          As a result, there remain significant issues of material fact whether Brockett made

13  sexually inappropriate comments to plaintiff, or engaged in sexually inappropriate conduct,

14  including the dates, context and content of each alleged misconduct.

15          Nevertheless, the court finds that summary judgment should be granted for

16  Brockett on plaintiff's claims of verbal sexual harassment prior to December 20, 2003, based on

17  plaintiff's deposition testimony that he had no physical contact with Brockett prior to that date.

18  (Pltf. Depo. at 155-56; 158.)  Although plaintiff testified that Brockett attempted to touch him in

19  a sexual manner prior to December 20, 2003, he also testified that he "ke[pt] moving it where she

20  can't touch me."  (<u>Id.</u> at 157.)  Sexually inappropriate statements and/or conduct that does not

21  include touching have routinely been found "not sufficiently serious" to sustain an Eighth

22  Amendment claim.  <u>Austin v. Terhune</u>, 367 F.3d 1167, 1172 (9th Cir. 2004) (sexually explicit

23  conduct and statement that did not involve touching); <u>accord</u> <u>Watson v. Carter</u>, 668 F.3d 1108,

24  1114 (9th Cir. 2012) (brief sexually suggestive touching combined with laughter "not objectively

25  harmful enough to establish a constitutional violation") (citation and internal punctuation

26  omitted); <u>see</u> <u>also</u> <u>Johnson v. Carroll</u>, 2012 WL 2069561, *28-31  (E.D. Cal. 2012) (summary of

1   pertinent cases).  Plaintiff's similar claims against Brockett commencing December 20, 2003 are

2   too intermingled with his claims of sexual misconduct to draw any independent legal conclusions

3   at this time.[16]

4           In contrast, application of the rebuttable presumption analysis articulated in <u>Wood</u>

5   requires a ruling adverse to Brockett on plaintiff's sexual misconduct claims, commencing

6   December 20, 2003.  Plaintiff is entitled to an initial presumption that any sexual contact

7   between plaintiff and Brockett was non-consensual.  The burden then shifts to Brockett to

8   demonstrate that the challenged conduct was consensual.  Brockett has failed to meet her burden.

9   In addition to the inherent power disparity between plaintiff and Brockett, plaintiff's interactions

10  with Brockett, in December 2003 and January 2004, were facilitated and encouraged by OIA

11  investigators.  Because plaintiff was allegedly intent on snaring Brockett in official misconduct,

12  at the direction of other correctional officials, his alleged sexual interactions with Brockett

13  cannot be said to lack official coercion, even if staff discouraged plaintiff from engaging in

14  sexual conduct.  Any allegedly personal interest that plaintiff may have had in a consensual

15  sexual relationship with Brockett, which plaintiff denies, is overshadowed by OIA's reliance on

16  plaintiff, underscored by plaintiff's officially facilitated recording of his interactions with

17  Brockett.  The court finds these factors "fairly characterized as coercive."  <u>Wood</u>, 692 F.3d at

18  1049.  Moreover, plaintiff testified that he engaged in sexual activity with Brockett solely for

19  purposes of the investigation; that he did not like Brockett; and that he asked Chapman to stop

20  the investigation before his relationship with Brockett became "too personal."  Additionally, as

21  noted above, the IAU found plaintiff to be a "reliable informant," while it found Brockett to be

22  dishonest in her interview.  (IAU Rpt. at 2-7.)

23          Defendants' numerous protests throughout their briefing that plaintiff

24  "volunteered" to participate in the OIA investigation, and was not "promised anything" for his

25

26      [16]  Similarly, it will be up to the trial judge to determine whether the prior comments are
    admissible to put the later alleged conduct in context.

1  participation, are immaterial, given the official imprimatur of the investigation.  Also immaterial

2  are Brockett's protests that she was unaware of the OIA investigation against her, and of

3  plaintiff's participation in the investigation.  Moreover, plaintiff's documented mental health

4  issues raise additional questions concerning plaintiff's ability to engage in a consensual sexual

5  relationship with a correctional officer, as well as plaintiff's ability to "volunteer" in an

6  investigation of official misconduct.

7          For these several reasons, the undersigned finds that Brockett has failed to meet

8  her burden of demonstrating that her alleged sexual interactions with plaintiff were consensual.

9  This issue, and the further determinations whether Brockett acted with a "sufficiently culpable

10  state of mind," and whether plaintiff was objectively harmed, must await trial.

11          Application of defendant Brockett's qualified immunity defense does not dictate

12  a different result.  Qualified immunity does not apply where the facts, construed in the light most

13  favorable to the party asserting the injury, show a violation of a clearly established constitutional

14  right of which a reasonable official should be aware.  Anderson v. Creighton, 483 U.S. 635, 640

15  (1987).  Brockett does not challenge clearly established law rendering it unconstitutional for a

16  prison official to engage in nonconsensual sexual activity with a prison inmate, of which a

17  reasonable correctional officer should have been aware.  Schwenk, 204 F.3d at 1197-8; see also

18  Wood, 692 F.3d at 1045-47 (citing established law).  Accepting as true plaintiff's allegations that

19  Brockett, against plaintiff's wishes, "French kissed" him, touched his genitals, slapped his butt,

20  and orally copulated plaintiff, Brockett's conduct violated clearly established law of which

21  Brockett should have been aware.  Anderson v. Creighton, supra, 483 U.S. at 640.  For these

22  reasons, the court finds that Brockett is not entitled to qualified immunity on plaintiff's Eighth

23  Amendment sexual misconduct claim.

24          B.  Eighth Amendment Claims Against Defendants Kelly, Jaffe and Martin

25              1.  Introduction

26          As earlier noted, defendants Kelly, Jaffe and Martin were all mental health

professionals at CSP-SAC during the relevant periods.  (Dkt. No. 164 at 22-5.)  Defendant K. Kelly, Ph.D., worked as CSP-SAC's Chief Psychologist from January 2000 through June 2009. Defendant Jaffe, M.D., worked as CSP-SAC's Chief Psychiatrist from January 1998 to August 2011.  Defendant J. Martin, Ph.D., worked as a Senior Supervising Psychologist at CSP-SAC from March 2002 to September 2008 (with the exception of May to November 2006).[17]

Pursuant to ruling on defendants' motions to dismiss, the court found that plaintiff states cognizable Eighth Amendment claims against defendants Kelly, Jaffe and Martin for alleged:  (1) failure to provide plaintiff with constitutionally adequate mental health care; (2) failure to protect plaintiff from a substantial risk of harm; and (3) against Kelly and Jaffe only, supervisory liability premised on the first two theories  (See Dkt. No. 78 at 18; Dkt. No. 89.)

These defendants move for summary judgment on the limited theory that the relevant scope of their responsibility is limited to their respective participation in reviewing one of plaintiff's administrative appeals (Log No. SAC 06-0783).  Relying on established law that the administrative processing of an inmate appeal cannot, in itself, serve as a basis for liability under Section 1983, defendants' counsel argues that the involvement of Kelly, Jaffe and Martin in processing plaintiff's subject appeal fails to state an actionable claim.

For the reasons set forth below, the undersigned finds that the involvement of these defendants appears to be potentially far more integral to plaintiff's claims than counsel asserts.  However, in light of defendants' limited summary judgment theory, the court first recounts each of the three administrative appeals exhausted by plaintiff in which defendants Martin, Kelly and/or Jaffe participated.

////

////

---

[17]  "At each institution, the MHSDS operates under the management of the Chief of Mental Health or the Clinical Director.  This individual is typically the Chief Psychiatrist, Chief Psychologist, or Senior Psychologist."  CDCR's Inmate Medical Services Policies & Procedures Manual ("IMSP&P Manual"), vol. 12 ("Mental Health Services"), at 12-1-2.

1        2.  Relevant Administrative Appeals

2            a.  Log No. SAC 06-00783

3        This is the only administrative appeal cited by defendants Kelly, Jaffe and Martin

4    in support of their motion for summary judgment.

5        On March 26, 2006, less than one year after his return to CSP-SAC, plaintiff filed

6    an inmate appeal pursuant to which he "respectfully request[ed] that CSP-Sacramento prison

7    officials and mental health staff transfer appellant to Atascadero State Hospital ("ASH") for

8    optimal treatment."  (Dkt. No. 35-2 at 4.)  Plaintiff explained in pertinent part (id. at 4, 6):

9            Appellant has been diagnosed to have a serious post-traumatic
             stress disorder, amongst other disorders.  Appellant became the
             victim of sexual abuse while he was housed in the CSP-
10           Sacramento EOP Program.  As a direct result of appellant's
             complaint against former officer Mary Brockett[,] [her]
11           employment was terminated with the CDCR in response to
             appellant reporting said misconduct.  Appellant [was] subjected
12           [to] intermidiate (sic) sanctions in lieu of false rule violations and
             illegal placement into ASU based on false inmate-manufactured
13           confidential information as a form of retaliation and retribution for
             appellant's cooperation with the Office of Internal Affairs.
14           Appellant continue[s] to experience significant stress and anxiety
             as a result of the incidents surrounding his past events of sexual
15           abuse and ongoing events of retaliation and retribution by some
             custody and mental health staff; since appellant's arrival back to
16           CSP-SAC it has been extremely stressful circumstances, due to
             appellant hearing unwanted voices and feeling depressed and
17           paranoid.  Appellant is continuing to have unwanted flash backs of
             these acts of sexual (sic) by former officer Mary Brockett.
18           Appellant continue[s] to have nightmares, vomiting and rage.
             Appellant can not talk about his the (sic) sexual abuse, due to
19           custody staff['s] ongoing violations of appellant's confidential
             patient rights.
20

21           Informal and formal level review were bypassed.  (Id. at 4.)

22       On May 8, 2006, defendant Martin issued a First Level Response, pursuant to his

23   interview of plaintiff on April 20, 2006, and a discussion with plaintiff's unidentified

24   Administrative Segregation Enhanced Outpatient Housing Correctional Counselor.  Martin

25   addressed only plaintiff's transfer request, denying the request on the ground that plaintiff was

26   ////

                                    32

"ineligible for ASH placement."[18]  (Id. at 8.)  Despite noting plaintiff's other allegations as his

contention that he had "posttraumatic stress disorder due to previous sexual abuse by an officer,

who was terminated," with additional "stress and anxiety due to retaliation and retribution by

some Custody and Mental Health Staff," Martin construed these matters as a "staff complaint"

that did not meet requisite criteria for further consideration.  (Id.)

Plaintiff objected to this decision on the following grounds (id. at 5, 7):

> Appellant is dissatisfied because No. 1 it appears that Dr. Martin
> and other CSP-SAC staff are attempting to downplay the
> seriousness of appellant's mental health problems following the
> sexual abuse of former officer Mary Brockett.  CDCR officials has
> (sic) subjected appellant to a series of retaliatory acts, including
> false CDCR Rule Violation Reports, as a form of retaliation and
> retribution for providing testimony against Officer Brockett, in the
> matter of [State Personnel Board] Case No. 04-0655.  Upon
> information and belief, appellant has been subjected to sexual
> abuse while confined in CSP-SAC EOP Program, which resulted
> in Officer Brockett's employment being terminated with CDCR.
> Appellant continue[s] to suffer permanent and lasting injuries
> including aggravation of serious mental disorder, including his post
> traumatic stress disorder.  So therefore, appellant request[s] to go
> to Atascadero State Hospital, or to the Intermediate Care Facility
> (ICF) at CMF [California Medical Facility] without further
> retaliation and retribution.

Pursuant to the Second Level Review of plaintiff's appeal, "M. Jaffe, M.D., Chief

Psychiatrist, reviewed this matter on behalf of Karen Kelly, Ph.D., Health Care Manager (A), at

California State Prison-Sacramento (SAC)."  (Dkt. No. 35-2 at 12.)  The Second Level Response,

apparently prepared by Jaffe, was issued on May 26, 2006, and signed by Kelly.  (Id. at 12-3.)

Both Jaffe and Kelly signed the Second Level Response on the appeal form.  (Id. at 3.)  The

narrative Second Level Response noted consideration of plaintiff's "Unit Health Record and all

---

[18]   Martin noted in pertinent part (Dkt. No. 35-2 at 8):

> Specifically, your institutional history of:  1) Maximum Custody;
> 2) S-Suffix;  3) Escape Risk (Walk Away in 1978); and 4) Recent
> history of Assault or Predatory Behavior (your High Desert State
> Prison 115 for Conspiracy to Murder a Peace Officer in March of
> 2005) makes a transfer to ASH currently not possible.

submitted documentation and supporting arguments," including plaintiff's First Level interview,

and that these matters were "evaluated in accordance with SAC's Operational Procedures and the

California Code of Regulations, Title 15." (Id. at 12.)  The appeal was denied at the Second

Level Review for the following reasons (id. at 13):

> At the Second Level, you request to go to the ICF at CMF, which is a new issue.  The appeals process does not allow for you to add to the "Actions Requested" in the original appeal.
>
> Dr. Martin did not "downplay" your mental health issues.  Instead, he clearly addresses the reasons why your request to go to ASH was not possible.  Your post-traumatic stress disorder (PTSD) claim is a self-reported one and not objectively documented in your Unit Health Record.  You are currently in the Enhanced Outpatient Program and at a level of care sufficient to care for all of your mental health needs.  PTSD is not one of the accepted recognized diagnoses treated in CDCR under the Coleman court mandate.
>
> The medical care of inmates is one of the highest concerns of the staff at SAC.  You are encouraged to use the sick call system and communicate with the medical staff via the normal procedures.  This institution endeavors to provide appropriate medical care and treatment commensurate with the community standard for health services.

Plaintiff thereafter sought Director's Level Review, on the following grounds, and

with supporting documentation (Dkt. No. 35-2 at 5, 9-11):

> In January 2000, Dr. Kelly agreed to accept appellant into CSP-SAC-PSU for therapeutic reasons.  According to a CDC-128C, by Dr. Grimes, appellant has a diagnosis of post-traumatic stress disorder.  On June 8, 2006, appellant received the Second Level Appeal Response from Dr. Jaffe and Dr. Kelly denying appellant's request to be transferred to Atascadero State Hospital.  Appellant's  request was based on the fact that appellant has a long history of suffering from major mental illnesses, including post-traumatic stress disorder due to being physically, sexually and emotional[ly] abused as a child which is clearly documented in appellant's CDCR mental health records. . . . Dr. Jaffe's Second Level Response is based on fraud and falsification of official state records, including perjury.
>
> . . . It is appellant's position that Dr. Jaffe and Dr. Kelly knew that appellant has been diagnosed to have a serious PTSD by CDCR psychologists and private court-appointed psychologists, including CSP-Sacramento psychologists, which is clearly documented in appellant's mental health records.  (Refer to confidential mental

health records dates January 26, 2000, May 14, 1996, March 25, 2004, June 28, 2004, and November 3, 2005.)[19]

[19]   Plaintiff attached to his request for Director's Level Review copies of the following records:

(1)  January 27, 2000 report of the Pelican Bay State Prison Psychiatric Services Unit ("PSU") ICC, approving plaintiff's transfer to CSP-SAC for therapeutic reasons, based on the recommendation of Dr. W. Grimes, as set forth in his "128 C dated 1/26/00."  The ICC report notes that the "Sr. Psychologist at SAC PSU has agreed to accept [plaintiff] according to this 128 C."  The report notes that plaintiff "has a diagnosis of Posttraumatic Stress, which would be exacerbated at Corcoran and is also associated with PBSP."  The report further provides, with emphasis:  "Committee acts to refer this case to the Classification Staff Representative (CSR) recommending transfer to SAC PSU with no alternate due to SAC having the only other PSU facility."  (Dkt. No. 35-2 at 14; see also Dkt. No. 193 at 13.)

(2)  Undated handwritten report by Pelican Bay psychologist Dr. William Grimes, stating that plaintiff had been a patient at PBSP since May 1998; listing plaintiff's prior diagnoses ("schizophrenia, paranoid; depression; bipolar disorder; cognitive disorder, NOS; and personality disorder, NOS"); and noting that "[h]e is most recently diagnosed as (sic) Post-Traumatic Stress Disorder, Schizoaffective disorder and Personality disorder, NOS."  The report notes plaintiff's prior violent confrontations with custody officers at CSP-Corcoran and PBSP.  Dr Grimes noted that, "[b]ecause of the unique nature of his mental disorder, Mr. Manago experiences 'flashbacks' when exposed to stimulus cues at PBSP which he associates with past trauma, and it is believed he will experience similar phenomena if returned to Corcoran."  Dr. Grimes noted that plaintiff "has made dramatic progress here at PBSP-PSU, but it is believed by both his treating psychologist and psychiatrist that further progress is not possible unless a change of environment can be effected."  Dr. Grimes concludes that "[o]ur Senior psychologist Dr. David Schwauber has communicated with Dr. Karen Kelly, Senior Psychologist at SAC-4 PSU who has agreed to admit Mr. Manago to her treatment unit for clinical care."  (Dkt. No. 35-2 at 15; see also Dkt. No. 193 at 12 (indicated that date of this document is January 26, 2000).)

(3)  March 25,2004 Mental Health Assessment (Form MH 1), providing an "IDTT [Interdisciplinary Treatment Team] Update for EOP," at Salinas Valley State Prison, after plaintiff had been housed there for a period of 63 days.  The Update is signed by a psychiatrist and two psychologists, and provides in pertinent part Axis I diagnoses is of "Schizoaffective Disorder, Posttraumatic Stress Disorder, and Polysubstance Dependence in Institutional Remission," and an Axis V (Global Assessment of Functioning or "GAF" score) of 55.  (Dkt. No. 35-2 at 18.)

(4)  June 28, 2004 Suicide Risk Evaluation (Form MH 3), noted June 4, 2004 suicide attempt, but current low imminent risk of same, with diagnoses including PTSD.  (Dkt. No. 35-2 at 19.)

(5)  November 3, 2005 report (Form CDC 128C) of Clinical Psychologist D.

35

It is appellant's position that Dr. Jaffe, Dr. Kelly and Dr. Martin did an absolutely pathetic and superficial job of investigating appellant's serious claims in order to foster a code of silence concerning the sexual abuse and retaliation and retribution.

The Director's Level Review, issued September 18, 2006 by Appeals Coordinator Grannis, adopted the findings of the Second Level Review, noting that plaintiff's allegations against Brockett were addressed in a separate administrative appeal (Log No. SAC-04-0946), and that "[i]n this case, the institution has provided the appellant with a thorough response. The appellant is encouraged to avail himself of the treatment available to him within the CDCR Mental Health Services Delivery System. There is no basis to grant the appellant's request for a transfer to ASH or cause to intervene at the DLR [Director's Level Review]." (Dkt. No. 35-2 at 2.)

### b. Log No. SAC 06-1729

On June 12, 2006, plaintiff filed an appeal alleging perjury, "fraud and falsication (sic) of official state records" by "M. Jaffe, M.D., Chief Psychiatrist, R. Kelly, Ph.D., Health Care Manager, and J. Martin, Ph.D., Senior Psychologist at CSP-Sacramento." (Dkt. No. 35-2 at 23.) Plaintiff challenged the representations of these officials, pursuant to plaintiff's prior appeal (Log No. SAC 06-00783), that they had reviewed all of plaintiff's mental health records and concluded that plaintiff did not suffer from PTSD, either historically or "due [to] sexual abuse by former officer Mary Brockett;" nor did they recognize plaintiff's "further alle[gation] that he has stress and anxiety due to ongoing retaliation and retribution by some custody and mental health staff." (Id. at 30.) Plaintiff alleged (id. at 31):

---

Wheeler, Psy.D., "Ad Seg EOP Case Manager," stating in pertinent part that "PTSD symptoms remain a feature of [plaintiff's] presentation" and "often appear to exacerbate his condition." Dr. Wheeler concluded that, "[f]or that reason, it is felt that the previous chrono by Dr. Grieves (sic) should still be considered in making a potential placement decision for this inmate." The remainder of the CDC 128C indicates that the chrono of PBSP's Dr. Grimes (not Dr. Grieves) is referenced. (Dkt. No. 35-2 at 16-17.)

> It is appellant's position that Dr. Jaffe, Dr. Kelly and Dr. Martin
> knew that appellant has been diagnosed to have a serious PTSD by
> CDCR mental health staff at Pelican Bay, CSP-Sacramento,
> Salinas Valley and outside private psychologists which is clearly
> documented in appellant's mental health records.  It is appellant's
> position that Dr. Jaffe, Dr. Kelly and Dr. Martin did an 'absolutely
> pathetic and superficial job of investigating appellant's inmate
> appeal log No. SAC-H-06-00783, in order to foster a code of
> silence concerning the sexual abuse and retaliation and retribution.

Plaintiff requested "that this matter be fully investigated by state and federal officials and that

criminal charges be filed against the mentally unstable supervisors named herein." (Id. at 23.)

Informal level review was bypassed. (Id. at 23.)  On October 11, 2006, after

interviewing plaintiff on September 20, 2006, Dr. Martin issued the First Level Response.

Martin again ignored plaintiff's challenges to his mental health care, again finding that plaintiff's

grievance did not qualify as a staff complaint, and that plaintiff's request for transfer to ASH had

already been denied.  (Id. at 25.)  Martin "again denied" plaintiff's request for a transfer to ASH,

for the reasons noted in response to plaintiff's appeal designated Log No. SAC-06-0783, with the

exception that Martin withdrew his prior finding that plaintiff "has a history of 'recent' predatory

behavior."  (Id.)

Plaintiff requested Second Level Review, noting that he was "dissatisfied because

Dr. Martin did not address all the issues at hand, including the documentation at hand concerning

the (PTSD) and the documents in my Unit Health Records clearly show that Drs. Jaffe and Kelly

lied.  I want this fully investigated."  (Id. at 24.)

Dr. Kelly issued the Second Level Response on November 30, 2006, noting that

Dr. Jaffe had "reviewed his matter of behalf of" Kelly.  (Id. at 26.)  Both Kelly and Jaffe signed

the Second Level Response on the appeal form.  (Id. at 24.)  The narrative Second Level

Response provided in full (id. at 27):

> You indicate that Dr. Jaffe and Dr. Martin lied in that they did not
> recognize your claim for PTSD and did not refer you to Atascadero
> State Hospital.  Parenthetically speaking, PTSD is not a disorder
> recognized to be treated in the CDCR when it is, in fact diagnosed.
> Your request for consideration to Atascadero State Hospital is not

1    granted for the reasons stated by Dr. Martin.

2    The medical care of inmates is one of the highest concerns of the
     staff at SAC. You are encouraged to use the sick call system and
3    communicate with the medical staff via the normal procedures.
     This institution endeavors to provide appropriate medical care and
4    treatment commensurate with the community standard for health
     services.
5

6        Thereafter, in seeking Director's Level Review, plaintiff alleged that "Drs. Kelly

7    and Jaffe are engaged in criminal corruption at CSP-Sacramento and attempting to cover up staff

8    sexual misconduct relating to this appeal," and requested "that the Director order a full

9    investigation." (Id. at 24.) Chief of Inmate Appeals, N. Grannis, denied this appeal at the

10   Director's Level on February 6, 2007. The Director's Level Decision provided in full (id. at 21):

11       It appears that SAC mental health staff provided the appellant with
         the appropriate response in a previous appeal (SAC 06-00783),
12       when he requested to be transferred to ASH. The appellant was
         advised his classification level and prior escape history did not
13       warrant such a transfer, nor did his misleading self-assertion of
         predatory behavior. Although the appellant claims he has PTSD,
14       he was advised this condition is not treated in the Mental Health
         Services Delivery System (MHSDS). There is no indication that
15       Dr. Jaffe, Dr. Kelly and/or Dr. Martin provided fraudulent
         information to the appellant regarding his request for a transfer to
16       ASH. The appellant is appropriately housed at SAC, Psychiatric
         Services Unit and is receiving the appropriate mental health
17       intervention commensurate with his level-of-care, as outlined in
         the MHSDS Guidelines (1997). After review, there is no
18       compelling evidence that necessitates intervention at the Director's
         Level of Review.
19

20              c.  Log No. SAC 06-0264

21       On October 23, 2006, plaintiff filed an appeal alleging that he was not

22   receiving adequate mental health treatment at CSP-SAC. Plaintiff recounted his alleged

23   interactions with Brockett, and his allegations of staff retaliation due to plaintiff's participation in

24   the Brockett investigation, including being "subjected to intermediate sanctions in lieu of false

25   rule violation reports and illegal placement in (PSU) based on false inmate manufactured

26   confidential information"; he identified symptoms of PTSD, stress, anxiety, hearing unwanted

voices, feeling depressed and paranoid, having flashbacks of the alleged sexual abuse, nightmares, vomiting, and rage; and stated that he was unable to confide in the CSP-S mental health staff. (Dkt. No. 35-3 at 13, 15.) Plaintiff "respectfully request[ed] a transfer to the intermediate care facility at Vacaville [CMF] or Atascadero State Hospital for Mental Health Treatment" and that he "be provided with all reports related to this request." (Id. at 13.)

Pursuant to their prior motion to dismiss, defendants provided only the Director's Level Decision on this administrative appeal. Review of that decision, and the pertinent 602 form, indicates that informal level review was bypassed. At the First Level Review, CSP-SAC Senior Psychologist Henry Raming, Ph.D., partially granted plaintiff's appeal on January 3, 2007, based in part on his interview of plaintiff. As recounted at the Director's Level Review (id. at 11):

> Dr. Raming states that the appellant is correct in his contention that he has been previously diagnosed as having PTSD and clinicians have included that diagnosis in the clinical record. However, clinical staff currently report no symptoms of PTSD in the appellant's functioning and presentation in the PSU program. Further, the primary reason for the first denial regarding safety issues at the DLR, still remain valid. Neither the CMF or ASH will accept maximum security (Level IV) inmates with histories of violence because of safety and security issues in their less structured settings, which include dormitory living. Therefore, a referral to these institutions is not feasible.

> Dr. Raming indicates that the appellant was correctly informed by mental health staff that PTSD is not accepted as the primary diagnosis or focus of treatment in the CDCR. However, any stress related issue can be addressed in his overall treatment plan and the appellant can discuss his PTSD-related problems with his primary clinician. As a secondary problem, PTSD can be included in the appellant's treatment plan. Dr. Raming noted that the appellant is currently stating that he cannot confide in his primary clinician, whom he believes is part of a custody conspiracy against him.

Plaintiff expressed dissatisfaction with Dr. Raming's First Level decision, asserting in part that CMF had adequate facilities to meet plaintiff's needs, specifically, single cells for high security ("Level IV") inmates. (Id. at 11, 16.)

////

1    Dr. Jaffe rendered the Second Level Review decision, denying plaintiff's appeal

2    on February 22, 2007.  The denial on the appeal form indicates "See Attached Letter" (id. at 14),

3    but this letter has not been included in the parties' exhibits.  As recounted at the Director's Level

4    Review, plaintiff "was informed that the appeals process does not allow him to add the 'Actions

5    Requested' in the original appeal.  Therefore, any additional actions requested in the instant

6    appeal cannot be considered at this time.  (Id. at 11.)

7    Plaintiff thereafter sought Director's Level Review, stating, "Appellant is

8    dissatisfied because prison officials are playing word games and attempted to cover up their

9    ongoing retaliation and retribution." (Id.)

10    The Director's Level Decision, issued by Grannis on June 11, 2007, denied

11    plaintiff's appeal, and reaffirmed the findings and conclusions of the prior levels of review.  The

12    Director's Level Decision provided in full (id. at 12):

13    The DLR reviewed the issues of the appellant's appeal and
reaffirms the institution's examination and conclusions as
14    addressed within the SLR [Second Level Review].  In this case, the
institution has provided the appellant with a thorough response.
15    The appellant is encouraged to avail himself of the treatment
available to him within the CDCR Mental Health Services
16    Delivery System.  There is no basis to grant the appellant's request
for a transfer to the CMF or ASH.  There is no cause to intervene at
17    the DLR.

18    3.  Processing of Plaintiff's Administrative Appeals

19    In general, a defendant's participation in the administrative review or denial of a

20    plaintiff's inmate appeal does not give rise to a cause of action, particularly one premised on due

21    process rights.  See, e.g., Mann v. Adams, 855 F.2d 639, 640 (9th Cir. 1988), cert. denied, 488

22    U.S. 898 (1988) (no constitutional right to an inmate appeal or grievance process).  Thus,

23    "participation in the prison grievance process does not give rise to a cause of action."  Lewis v.

24    Ollison, 571 F. Supp. 2d 1162, 1170 (C.D. Cal. 2008) (dismissing corrections personnel who

25    participated in the review and denial of plaintiff's inmate appeals); Buckley v. Barlow, 997 F.2d

26    494, 495 (8th Cir. 1993) (prison official's involvement in administrative appeals process cannot

serve as a basis for liability in a Section1983 action); Azeez v. DeRobertis, 568 F. Supp. 8, 10

(N.D. Ill. 1982) ("[A prison] grievance procedure is a procedural right only, it does not confer

any substantive right upon the inmates.")  These authorities support defendants' contention that

plaintiff is unable to state a cause of action against a prison official, under federal due process

law, based on the official's unfavorable action in processing one of plaintiff's administrative

appeals.

However, prison officials, particularly those in administrative positions, may be

"liable for deliberate indifference when they knowingly fail to respond to an inmate's requests

for help." Jett v. Penner, 439 F.3d 1091, 1098 (9th Cir. 2006), citing Estelle v. Gamble, 429 U.S.

97, 104 (1976); and Greeno v. Daley, 414 F.3d 645, 652-3 (7th Cir. 2005).  A correctional

official, particularly one with supervisory authority, who is informed of an alleged constitutional

violation (e.g. pursuant to reviewing an inmate's administrative appeal), may be responsible for

remedying such violation.  Jett at 1098.  "A supervisor may be liable for an Eighth Amendment

violation if he or she was made aware of the problem and failed to act or if he or she promulgated

or enforced a policy under which unconstitutional practices occurred."  Valley v. Director of

Prisons, 2008 WL 436954, *5  (E.D. Cal. 2008), citing Jett, 439 F.3d at 1098; and Black v.

Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).

Two of the mental health professionals who are defendants in this action held

supervisory positions during the relevant periods:  Kelly was CSP-SAC's Chief Psychologist

from January 2000 through June 2009; and Jaffe was CSP-SAC's Chief Psychiatrist from

January 1998 to August 2011.  Although Martin states that was employed at CSP-SAC as a

Senior Supervising Psychologist at CSP-SAC (Martin Decl., Dkt. No. 180-5 at 2), he is

designated only as a "Staff Psychologist" in his First Level Decisions denying plaintiff's subject

administrative grievances.  (See Dkt. No. 35-2 at 8, 25.)  In contrast, defendants Kelly and Jaffe

had significant roles in the provision and oversight of CSP-SAC mental health services during

the events underlying this action.  Moreover, each of these defendants was put on notice,

1    pursuant to the above-noted administrative appeals, of plaintiff's mental health treatment

2    concerns and his request for assistance.  For these reasons, and the additional reasons noted

3    below, the court finds that plaintiff's Eighth Amendment claims against mental health defendants

4    Kelly and Jaffe remain cognizable, but not his claims against Martin.

                    4.  Legal Standards for Eighth Amendment Deliberate Indifference Claims

                            a.  Common Deliberate Indifference Analysis

7            The court previously found, pursuant to ruling on defendants' motion to dismiss,

8    that plaintiff's Eighth Amendment claims against defendants Kelly, Jaffe and Martin are

9    premised on theories of deliberate indifference to plaintiff's mental health treatment needs,

10   failure to protect, and supervisory liability.  (Dkt. No. 78 at 18.)  Review of plaintiff's claims in

11   light of the expanded factual record demonstrates that, as to the mental health defendants, these

12   claims are virtually identical.

13           The Fourth Circuit Court of Appeals has noted that "the standard of liability is the

14   same" for assessing overlapping failure to protect claims, and deliberate indifference to serious

15   medical needs claims, "and therefore independent analysis of each count is unnecessary."  Parrish

16   ex rel. Lee v. Cleveland, 372 F.3d 294, 302 (4th Cir. 2004), citing Young v. City of Mount

17   Ranier, 238 F.3d 567, 575 (4th Cir. 2001).  As explained in Young:

18                   [A failure to protect] claim is no different in any meaningful
                     respect from the indifferent-to-medical-needs claim and is
19                   governed by the same standard of deliberate indifference.  See
                     Wilson v. Seiter, 501 U.S. 294, 303 (1991) (finding "no significant
20                   distinction between claims alleging inadequate medical care and
                     those alleging inadequate 'conditions of confinement'" and
21                   concluding that an inmate's failure-to-protect claim must be
                     measured under the deliberate indifference standard); Hare v. City
22                   of Corinth, 74 F.3d 633, 644 (5th Cir.1996) (en banc) (noting "the
                     absence of a constitutionally significant distinction between
23                   failure-to-protect claims and medical care claims").  We therefore
                     conclude that the [plaintiffs'] claims must be measured under a
24                   standard of deliberate indifference.

25   Young v. City of Mount Ranier, supra, 238 F.3d at 575.  The Fourth Circuit's reliance on a

26   common deliberate indifference analysis to assess factually similar claims alleging both a failure

1  to protect and deliberate indifference to serious medical needs, is consistent with Ninth Circuit

2  legal standards.

3              b.  Deliberate Indifference to Serious Mental Health Needs

4              Prisoners have a constitutional right to adequate mental health care.  "The

5  obligation to provide for the basic human needs of prisoners includes a requirement to provide

6  access to adequate mental health care."  Coleman v. Wilson, supra, 912 F. Supp. at 1298, citing

7  Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994) (holding "that the requirements for

8  mental health care are the same as those for physical health care needs"); and Hoptowit v. Ray,

9  682 F.2d 1237, 1253 (9th Cir. 1982), abrogated on other grounds by Sandin v. Conner, 515 U.S.

10  472 (1995).  "If the state fails to meet this obligation, 'it transgresses the substantive limits on

11  state action set by the Eighth Amendment.'"  Coleman, 912 F. Supp. at 1298, quoting Helling v.

12  McKinney, 509 U.S. 25, 32 (1993) (internal citation omitted).

13             An Eighth Amendment claim of deliberate indifference to serious mental health

14  needs may be actionable against both medical and correctional staff.  "This is true whether the

15  indifference is manifested by prison doctors in their response to the prisoner's needs or by prison

16  guards in intentionally denying or delaying access to medical care or intentionally interfering

17  with the treatment once prescribed."  Estelle, 429 U.S. at 104-05 (internal quotations, citations,

18  and footnotes omitted).

19             "In the Ninth Circuit, the test for deliberate indifference consists of two parts.

20  First, the plaintiff must show a serious medical need by demonstrating that failure to treat a

21  prisoner's condition could result in further significant injury or the unnecessary and wanton

22  infliction of pain.  Second, the plaintiff must show the defendant's response to the need was

23  deliberately indifferent.  This second prong . . . is satisfied by showing (a) a purposeful act or

24  failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the

25  indifference."  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations, punctuation

26  and quotation marks omitted).

To establish deliberate indifference to an inmate's serious mental health needs, the plaintiff must show that the defendant both knew of, and disregarded, an excessive risk to plaintiff's health or safety.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  As summarized by this court in Coleman:

> The question . . .  whether a defendant charged with violating rights protected by the Eighth Amendment has the requisite knowledge is "a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence [citation omitted], and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." [Farmer] at114 S. Ct. at 1981.  The inference of knowledge from an obvious risk has been described by the Supreme Court as a rebuttable presumption, and thus prison officials bear the burden of proving ignorance of an obvious risk. [Id.] at 1982.  It is also established that defendants cannot escape liability by virtue of their having turned a blind eye to facts or inferences "strongly suspected to be true." [Id.] at 1982 n. 8, and that "[i]f ... the evidence before the district court establishes that an inmate faces an objectively intolerable risk of serious injury, the defendants could not plausibly persist in claiming lack of awareness." [Id.] at 1984 n.9.

Coleman v. Wilson, 912 F. Supp. at 1316.

Prisons officials defending a deliberate indifference claim may avoid liability by demonstrating "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." Farmer, 511 U.S. at 844.  Thus, a prison official may avoid liability by presenting evidence that he lacked knowledge of the risk and/or that his response was reasonable in light of all the circumstances.  Id. at 844-45; see also Wilson v. Seiter, 501 U.S. 294, 298 (1991); Thomas v. Ponder, 611 F.3d 1144, 1150-51 (9th Cir. 2010).

### c.   Failure to Protect

"[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer, 511

1  U.S. at 847.  The duty to protect a prisoner from serious harm requires that prison officials take

2  reasonable measures to guarantee the safety and well being of the prisoner.  Id. at 832–33; Frost

3  v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998).  To sustain a failure to protect claim on summary

4  judgment, the inmate must demonstrate that he was incarcerated under conditions posing a

5  substantial risk of harm and that prison officials were deliberately indifferent to those risks.

6  Farmer, 511 U.S. at 834; Frost, 152 F.3d at 1128; Redman v. County of San Diego, 942 F.2d

7  1435, 1443 (9th Cir. 1991).

8                              d.  Supervisory Liability

9             Supervisory liability may be imposed in an individual capacity only when the

10  supervisor participated in or directed the violations, or knew of the violations of subordinates and

11  failed to act to prevent them.  Corales v. Bennett, 567 F.3d 554, 570 (9th Cir. 2009).  "Under

12  Section 1983, supervisory officials are not liable for actions of subordinates on any theory of

13  vicarious liability.  A supervisor may be liable if there exists either (1) his or her personal

14  involvement in the constitutional deprivation, or (2) a sufficient causal connection between the

15  supervisor's wrongful conduct and the constitutional violation."  Hansen v. Black, 885 F.2d 642,

16  645-46 (9th Cir. 1989) (citations omitted).  Thus, "[a]lthough there is no pure respondeat

17  superior liability under § 1983, a supervisor is liable for the acts of his subordinates 'if the

18  supervisor participated in or directed the violations, or knew of the violations [of subordinates]

19  and failed to act to prevent them.'"  Preschooler II v. Clark County School Bd. of Trustees, 479

20  F.3d 1175, 1182 (9th Cir. 2007), quoting Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

21  Facts consistent with at least one of these scenarios must be presented in order to sustain the

22  claim against a supervisory defendant on summary judgment.  Officials can be held liable for

23  their failure to implement a proper mental health care program or failure to adequately train or

24  supervise subordinates.  Greason v. Kemp, 891 F.2d 829, 836–37 (11th Cir.1990).

25             In addition, as earlier noted, a supervisor who is informed of an alleged Eighth

26  Amendment violation, e.g. pursuant to reviewing an inmate's administrative grievance, may be

1  liable if he or she failed to remedy it.  Jett v. Penner, supra, 439 F.3d at 1097-98.

2         5.  Analysis

3            a.  Serious Mental Health Needs

4         The undersigned finds, for purposes of summary judgment, that plaintiff's mental

5  health needs, during all relevant periods, were "serious" within the meaning of the Eighth

6  Amendment.

7         Based on a review of plaintiff's mental health records, Defendant K. Kelly, CSP-

8  SAC Chief Psychologist, states that plaintiff had the following psychological diagnoses while

9  incarcerated at CSP-SAC (Kelly Decl., Dkt. No. 166 at 2-3):

10       [Plaintiff was] primarily diagnosed with Schizophrenia, paranoid
      type; Schizoaffective Disorder, and Polysubstance Dependence, in
11       institutional remission.  For a brief period of time, he also received
      a second diagnosis of Post Traumatic Stress Disorder.  Throughout
12       the review period, Manago was also diagnosed (not inclusive) with
      Malingering, Intermittent Explosive Disorder, Psychotic Disorder
13       NOS, and with No Severe Mental Disorder.

14 No defendant disputes that these diagnoses represent serious psychological conditions, which

15 significantly impacted plaintiff's daily activities; nor does any defendant dispute that failure to

16 treat or accommodate these conditions could result in significant harm, or a significant risk of

17 harm, to plaintiff.  Estelle, 429 U.S. at 104.

18        As a result, the following Eighth Amendment analyses are limited to assessing

19 whether defendants responded to plaintiff's serious mental health needs with deliberate

20 indifference.

21           b.  Demonstration of Harm

22        To survive summary judgment on a deliberate indifference claim, plaintiff must

23 demonstrate that he was harmed by the alleged indifference.  See, e.g., Shapley v. Nevada Bd. of

24 State Prison Com'rs, 766 F.2d 404, 407 (9th Cir. 1985), citing Estelle, 429 U.S. at 106; see also

25 Hallett v. Morgan, 296 F.3d 732, 746 (9th Cir. 2002).  The undersigned finds, for purposes of

26 summary judgment, based on plaintiff's numerous allegations of intensified psychiatric

1    symptoms as set forth in his administrative appeals and recounted by the Prison Law Office, that

2    plaintiff suffered serious psychological harm due to his involvement in the Brockett

3    investigation; the alleged failure of CSP-SAC mental health staff to acknowledge this reality and

4    provide appropriate treatment; and plaintiff's resulting transfers to other institutions.

5                    c.  Defendant Kelly

6             Dr. K. Kelly, Ph.D., is a licensed clinical psychologist who worked as the Chief

7    Psychologist at CSP-SAC from January 2000 through June 2009; she also served as the CSP-

8    SAC Health Care Manager (Acting) from January 2006 through June 2007.  Kelly avers that she

9    "did not typically provide direct patient (inmate) treatment and . . . do[es] not recall providing

10   direct mental health treatment to inmate Stewart Manago."  (Kelly Decl., Dkt. No. 166 at 2-3.)

11   Kelly states that she has no recollection of plaintiff "personally informing me of an incident of a

12   sexual nature involving an officer," and, in any case, "was not responsible for conducting

13   investigations of allegations against custody staff."  (Id. at 3.)

14           Plaintiff testified at his deposition that he never received mental health treatment

15   from Dr. Kelly, but talked with her "numerous times," the first time in June 2000, right after

16   plaintiff was transferred to CSP-SAC.  (Manago Depo. at 134, 136.)  Plaintiff testified that, prior

17   to his transfer from PBSP, Dr. Kelly assured PBSP staff that plaintiff's care at CSP-SAC's EOP

18   unit would comply with the requirements of the Madrid decision.  (Id. at 136-37.)  Plaintiff stated

19   that when he first arrived at CSP-SAC, "everything was fine -- my PTSD, my diagnosis, my

20   medication. . . . [E]very time the special master[s] . . . from the Coleman and Madrid [cases]

21   came to CSP-SAC to tour [], Dr. Kelly asked where I'm at, so she'd come and find me on the

22   yard and say, Hey, look.  The special master want[s] to talk to you."  (Id. at 137.)

23           While not referenced in her declaration, Dr. Kelly does not dispute plaintiff's

24   allegations and evidence that Kelly, as CSP-SAC Chief Psychologist, was instrumental in

25   effecting plaintiff's 2000 transfer from PBSP to CSP-SAC, for therapeutic reasons.  This

26   apparently instrumental role in accepting responsibility for plaintiff's mental health care at CSP-

1  SAC, together with the fact that Kelly continued to work as CSP-SAC's Chief Psychologist

2  throughout all relevant periods, as well as CSP-SAC Health Care Manager (Acting) from January

3  2006 through June 2007, support an inference that Kelly was uniquely aware of plaintiff's

4  specific mental health needs.  While Kelly denies any direct role in providing treatment to

5  plaintiff, it is reasonable to infer that Kelly's responsibilities included oversight of plaintiff's

6  direct care, as well as any therapeutic considerations attendant to plaintiff's transfer to SVSP, and

7  ultimately back to CSP-SAC.

8          Plaintiff testified that "my diagnosis never was changing until I made allegations

9  against Brockett." (Id.)  "[T]hey [mental health staff] failed to provide adequate supervision

10  which resulted [in] me being sexually harassed and eventually sexually assaulted." (Id. at 134.)

11  "[W]hen I reported . . . that I was a victim of sexual assault and sexual harassment by Defendant

12  Brockett, they failed to provide me with a treatment plan, and then they allowed me to be

13  transferred to a place where they knew I wasn't going to get treatment to cover up those facts . . .

14  ." (Id. at 135.)  Plaintiff testified that, instead of addressing the issues, Kelly "tried to conceal the

15  wrongdoings and cover up the staff misconduct." (Id. at 134.)

16          Plaintiff testified that he is also suing Kelly for her "direct supervision of a senior

17  psychologist" (Dr. Martin), by rejecting plaintiff's allegation that Dr. Martin had "downplayed"

18  plaintiff's mental health needs, and by finding that plaintiff's alleged PTSD was self-reported and

19  unsupported by plaintiff's health care records. (Id. at 136, 138-39.)  Plaintiff testified that

20  Kelly's "own doctors diagnosed me with PTSD, but it was only after I reported that I was having

21  difficulty as a result of what Brockett subjected me to, now all of a sudden my PTSD don't

22  exist." (Id. at 139.)  "[W]hen . . . I reported this case, all of a sudden in my appeals they say my

23  PTSD don't exist no more . . . and that I never had PTSD and there's nothing in my mental health

24  records that identify me as having PTSD." (Id. at 135.)

25          As previously noted, Kelly seeks to limit her role in plaintiff's care to her

26  processing of one of plaintiff's administrative appeals (Log No. SAC-06-0783), pursuant to

48

which Kelly denied plaintiff's request to be transferred to Atascadero State Hospital, and

defended Dr. Martin's findings.  (Dkt. No. 35-2 at 13.)  Kelly asserts that her denial of plaintiff's

request for a transfer to ASH was supported by the criteria set forth in a Memorandum of

Understanding between CDCR and ASH, and that her findings concerning plaintiff's PTSD were

based on her opinion "[a]t the time," noting that "[a] patient's mental health diagnosis can vary

based on mental health providers' individual opinions[,] and diagnoses can also change over time

as the patient's symptoms change."  (Kelly Decl., Dkt. No. 166 at 3.)  Interestingly, Kelly seeks

to explain that "I did not state or suggest that Manago had never been diagnosed with PTSD by

some other mental [health] provider during his time in prison."  (Id.)  However, Kelly also does

not address her summary denial of plaintiff's subsequent administrative appeal (Log No. SAC

06-1729), challenging the actions of Kelly, Jaffe and Martin in denying plaintiff's prior appeal,

wherein Kelly stated only that "PTSD is not a disorder recognized to be treated in the CDCR

when it is, in fact[,] diagnosed."  (Dkt. No. 35-2 at 27.)

The court finds the narrow construction of their participation in only one of

plaintiff's appeals, by Kelly, Jaffe and Martin, to be self-serving.  This grievance was not filed

until 2006, during plaintiff's second incarceration at CSP-SAC.  Although plaintiff requested a

transfer to ASH, based in part on his PTSD, plaintiff also expressly sought "optimal treatment."

(Dkt. No. 35-2 at 4.)  Plaintiff explained that he was "experienc[ing] significant stress and

anxiety," and described symptoms including auditory hallucinations, depression, paranoia,

flashbacks, nightmares, vomiting and rage.  (Id.)  As demonstrated by the exhibits to plaintiff's

subsequent appeal (Log. No. SAC 06-1729) (supported by defendants' submission of plaintiff's

mental health records (see Defendants' Exh. N, Dkt. Nos. 166-80)), plaintiff was previously

diagnosed with PTSD, including, significantly, in the April 2000 "Discharge Psychological

Evaluation" prepared by PBSP psychologist Dr. Grimes, to facilitate plaintiff's mental health

treatment upon his transfer to CSP-SAC.  (Dkt. No. 193 at 16.)  Moreover, as found by CSP-

SAC Senior Psychologist Dr. Raming, pursuant to plaintiff's third relevant appeal (Log No. SAC

06-0264), while clinical staff reported no current symptoms of PTSD, plaintiff "is correct in his contention that he has been previously diagnosed as having PTSD and clinicians have included that diagnosis in the clinical record." (Dkt. No. 35-3 at 11.)  Dr. Raming further noted that, while "PTSD is not accepted as the primary diagnosis or focus of treatment in the CDCR . . . [a]s a secondary problem, PTSD can be included in the appellant's treatment plan." (Id.)

Finally, the court notes that the current record contains no evidence of direct communication between custodial and mental health staff regarding the appropriateness of plaintiff's participation in the Brockett investigation, or any assessment of the psychological risks to plaintiff by such participation.  No custodial or OIA defendant concedes awareness of plaintiff's mental status in December 2003 and January 2004, and no mental health defendant acknowledges awareness of the Brockett investigation at the time it occurred.[20]  The court finds this lack of communication improbable but, if true, a significant failing by OIA staff, as well as by mental health and custodial staff.  Such communications and considerations on behalf of any inmate sought to be used to facilitate an internal investigation of staff misconduct would appear to be imperative.

These several matters demonstrate the existence of material factual disputes concerning Kelly's subjective state of mind in providing, and supervising other mental health staff in providing constitutionally adequate mental health care and placements for plaintiff, and protecting plaintiff from psychological harm.  For these reasons, the undersigned recommends

---

[20]  However, the record demonstrates that plaintiff's CSP-SAC Clinical Case Manager, Dr. A. Gaerlan, Ph.D. (not a defendant in this action), was aware of plaintiff's OIA involvement during the investigation.  (See, e.g., Dkt. No. 167-2 at 3 (Dec. 22, 2003 entry, noting plaintiff's statement that "Tomorrow, he said, he will meet with people from 'Office of Internal Affairs.'"); (Dec. 22, 2003 entry, noting plaintiff's statement that he would not attend the Dec. 23, 2003 UCC meeting; "Besides, he'll be with the 'Office of Internal Affairs.'"); Dkt. No. 167-1 at 8 (Jan. 9, 2004 entry, noting that plaintiff "says he's doing alright.  He met with the people from the Office of Internal Affairs today."); Dkt. No. 166-5 at 8 (Jan. 14, 2004 entry noting, in context of plaintiff's anticipated transfer to SVSP, that the "Office of Internal Affairs will talk to him tomorrow or Friday").)  Moreover, it appears that Dr. Gaerlan routinely communicated with custodial defendants Vance and Kennedy, although no reference is made to the OIA investigation in this context.  (See, e.g., Dkt. Nos. 167-2 at 1; 167-3 at 9; 166-5 at 7-9.)

denial of defendants' motion for summary judgment on plaintiff's Eighth Amendment claims

against defendant Kelly, based on theories of deliberate indifference to serious mental health

needs, failure to protect, and supervisory liability.

d. <u>Defendant Jaffe</u>

Defendant M. Jaffe, M.D., worked as Chief Psychiatrist at CSP-SAC from

approximately January 1998 to August 2011.  Jaffe avers that, in this capacity, he "was primarily

a supervisor of mental health staff and did not typically provide direct patient (inmate) treatment.

. . ." (Jaffe Decl., Dkt. No. 180-6 at 1.)  Plaintiff does not allege that Dr. Jaffe was responsible

for directly providing mental health services to plaintiff.  (Pltf. Depo. at 140.)

Plaintiff testified at his deposition that he named defendant Jaffe in this action

based on his failure to investigate plaintiff's administrative claims of anxiety and retaliation

stemming from the Brockett investigation, and refusal to recognize plaintiff's PTSD.  (<u>Id.</u> at 140-

41.)  Thus, Jaffe's challenged conduct is limited to his participation in the Second Level Review

of two of plaintiff's appeals (Log No. SAC 06-0783 and Log No. SAC 06-1729 ).

Jaffe recalls limited contact with plaintiff, stating (Jaffe Decl. at 3):

> I do not recall personal interactions with Plaintiff Stewart Manago
> and did not provide him with mental health care or treatment.  I
> recall seeing Manago on one occasion while he was an inpatient,
> but I do not recall any conversations with him.

In his responses to plaintiff's First Set of Interrogatories, Jaffe conceded that he

recalled plaintiff's allegations, pursuant to his March 26, 2006 appeal (Log No. SAC 06-0783),

that he "was having flash backs of acts of sexual (sic) by officer Brockett," and "that he was

continuing to have nightmares, stress and rage over the sexual misconduct by officer Brockett."

(Dkt. No. 194-3 at 53-4.)  Asked if plaintiff had a "long history of suffering from major mental

illness, including Post Traumatic Stress Disorder, due to him being physically, sexually and

emotionally abused as a child by a[n] older female," Jaffe responded, "No.  Plaintiff claims more

illness than actually exists." (Dkt. No. 194-3 at 54.)  Jaffe denied that plaintiff had a record of

being diagnosed with PTSD, or that any CSP-SAC mental health staff reported such diagnosis. (Id. at 56, 57.)  Jaffe also opined that plaintiff "received appropriate [mental health] treatment to his issues but the sexual abuse has never, as far as I know, been substantiated."  (Id. at 55.) Nevertheless, Jaffe avers that he never knowingly denied or delayed plaintiff access to mental health treatment, or disregarded any known risk of injury to plaintiff.  (Id. at 3.)

For the reasons previously stated, particularly because plaintiff's mental health records and the express findings of Dr. Raming support plaintiff's complaints of PTSD, as well as other serious mental disorders, the court finds that Jaffe's persistent discrediting of these matters demonstrates the existence of material factual disputes concerning Jaffe's subjective state of mind, particularly whether Jaffe knowingly disregarded any obvious risks to plaintiff's mental health.  It is also reasonable to infer, given Jaffe's position as CSP-SAC Chief Psychiatrist at all relevant times, that Jaffe had additional opportunities to evaluate plaintiff's mental health services and potential risks to plaintiff's mental health, viz., plaintiff's 2000 transfer from PBSP, plaintiff's 2003-04 participation in the Brockett investigation, plaintiff's 2004 transfer to SVSP, and plaintiff's 2005 return to CSP-SAC.  For these reasons, the undersigned recommends denial of defendants' motion for summary judgment on plaintiff's Eighth Amendment claims against defendant Jaffe, based on theories of deliberate indifference to serious mental health needs, failure to protect, and supervisory liability.

e. Defendant Martin

Dr. J. Martin, Ph.D., worked at CSP-SAC from March 2002 to September 2008. Although Martin states that he worked as a Senior Supervising Psychologist who "did not typically provide direct patient (inmate) treatment," and does "not recall providing direct mental health treatment to inmate Stewart Manago" (Martin Decl., Dkt. No. 180-5 at 1), Martin is designated as a "Staff Psychologist" in his First Level Decisions denying plaintiff's subject administrative grievances (Dkt. No. 35-2 at 8, 25).

////

1    Plaintiff testified at his deposition that he was suing defendant Martin because of

2    his "active role in trying to cover up the sexual misconduct of defendant Brockett, including

3    manipulating and falsifying state official documents." (Pltf. Depo. at 139.)  This charge is

4    premised on Martin's repeated refusal to construe the allegations of plaintiff's subject grievances

5    as a challenge to the quality of plaintiff's mental health care, instead construing plaintiff's

6    allegations as a "staff complaint" against Brockett not subject to review.  Rather, Martin focused

7    on plaintiff's request for a transfer to ASH, and repeatedly denied the request.  (See Dkt. No. 35-

8    2 at 8 (Martin's First Level Response to Log No. 06-0783), and 25 (Martin's First Level

9    Response to Log No. 06-1729).)

10    Consistently, in his declaration, Martin "recalls" only that plaintiff informed him

11    "of an incident of a sexual nature involving an officer; it was my understanding that the matter

12    was already under investigation.  As a Senior Supervising Psychologist at CSP-SAC, I was not

13    responsible for any investigation of allegations against custodial staff." (Martin Decl., Dkt. No.

14    180-5 at 3.)  Moreover, Martin notes that "the records" demonstrate his participation in only one

15    of plaintiff's appeals (Log No. SAC 06-0783).  (Id.)  Finally, Martin states that he never

16    knowingly denied or delayed plaintiff's access to mental health treatment, or disregarded any

17    known risk of injury to plaintiff.  (Id. at 3.)

18    As previously noted, the undersigned declines to narrowly construe plaintiff's

19    March 26, 2006 grievance (Log No. SAC 06-0783) as solely a requested transfer to ASH; rather,

20    plaintiff's description of his psychological symptoms, and express goal of obtaining "optimal

21    treatment" (Dkt. No. 35-2 at 4, 6), reasonably required reviewing mental health staff to assess the

22    quality of plaintiff's mental health care at CSP-SAC and his rationale for requesting a transfer to

23    another facility's treatment program.  Therefore, the undersigned finds the existence of material

24    factual disputes concerning Martin's subjective state of mind in failing to consider the merits of

25    plaintiff's treatment allegations.  For this reason, the undersigned recommends denial of

26    defendants' motion for summary judgment on plaintiff's Eighth Amendment claims against

1    defendant Martin, based on theories of deliberate indifference to serious mental health needs, and

2    failure to protect, but not on a theory of supervisory liability.

3          C.   Eighth Amendment Claims Against Defendants Chapman and Williams

4                Defendants Chapman and Williams were each employed as "Special Agents" by

5    CDCR's Office of Internal Affairs-Northern Region.  Neither defendant is trained as a medical or

6    mental health provider.  Both defendants aver that they "had no authority to administer . . .

7    mental health services" to plaintiff; were "not responsible for the supervision of any person(s) at

8    the prisons that could affect Manago's care and treatment at the prison;" had "no supervisory

9    responsibility or authority over staff at CSP-SAC;" "never intentionally or deliberately

10   disregarded any known risk and/or serious injury" to plaintiff; and "never at any time attempted

11   to cause harm or incite or direct others to cause harm" to plaintiff.  (See Chapman Decl., Dkt.

12   No. 165-2 at 3; Williams Decl., Dkt. No. 165-6 at 3-4.)

13                As addressed below, and applying the legal standards set forth above, the

14   undersigned finds that plaintiff's Eighth Amendment claims, premised on the alleged deliberate

15   indifference to plaintiff's serious mental health needs, should proceed against Chapman, but not

16   Williams.

17          1.   Defendant Chapman

18                Chapman's integral role in the Brockett investigation, and her related interactions

19   with plaintiff, have been detailed above.  While it is clear that Chapman had no responsibility for

20   providing mental health services to plaintiff, nor is there an indication that she had any

21   supervisory role (other than over plaintiff), it is equally clear that Chapman, as the OIA agent

22   principally assigned to the Brockett investigation in December 2003 and January 2004, had some

23   responsibility for ensuring that plaintiff was not harmed due to his participation in the

24   investigation.  The record supports limited inferences that Chapman may have attempted to

25   assume this role after the conclusion of the investigation, pursuant to Chapman's apparent

26   representations to plaintiff that she would facilitate his transfer to the California Medical Facility.

(See Dkt. No. 193-4 at 20-1 (plaintiff's August 2004 letter to Chapman allegedly reminding her that, "You said that I would be transferred to (CMF) to assure me that I would not be subjected to the retaliation."); Dkt. No. 165-2 at 3 (Chapman's declaration statement that, "I do not recall the date, but I recall making arrangements for Manago's transfer from Salinas Valley State Prison to California Medical Facility (CMF).  I believe that I spoke with the warden at CMF requesting inmate Manago to be transferred there from Salinas Valley State Prison.").)

As earlier noted, the court finds the apparent lack of communication among OIA, custodial and mental health staff, relative to plaintiff's participation in the Brockett investigation, particularly troubling.  In the absence of any concessions or acknowledgments by defendants that someone bore the responsibility for inter-staff communication on this matter, the court finds that Chapman was uniquely positioned to assume that role.  It is reasonable to hold Chapman responsible for failing to assess whether plaintiff's participation in the Brockett investigation posed a substantial risk of serious harm to plaintiff's mental health.  The existing record demonstrates material factual disputes concerning whether Chapman deliberately disregarded these matters by failing to take appropriate measures to minimize harm to plaintiff.  Farmer, 511 U.S. at 847.

Accordingly, the undersigned recommends that plaintiff's Eighth Amendment failure to protect claim should proceed against Chapman.

2. Defendant Williams

Defendant B. Williams, OIA Special Agent during all relevant times, avers in pertinent part (Williams Decl., Dkt. No. 165-6 at 2-3):

> I began working for the California Department of Corrections and Rehabilitation in November 2003, and worked at the Headquarters Division of the Office of Internal Affairs as a Senior Special Agent where I ran a special investigations unit and a retaliation intake and investigations unit until May 2004.  On May 24, 2004, I was

////

////

assigned to the Office of Internal Affairs-Northern Region.[21]

Thus, Williams avers, because he was not assigned to the Northern Region until May 2004, he "was never directly involved in an investigation of Officer Mary Brockett," or the "'sting operation' involving Officer Brockett and Stewart Manago."  (Id.)  Moreover, Williams states that when he was assigned to Headquarters during the Brockett investigation, from November 2003 to May 2004, "an investigation of a correctional officer involving sexual misconduct [was] not the type of investigation that my staff typically would have handled," and "at most, I would sometimes receive briefings on investigations if there was anything unusual about the investigation."  (Id.)

Williams avers that he "never met or spoke[] with Stewart Manago to my recollection" (id. at 4), but acknowledges his participation in reviewing one of plaintiff's inmate appeals (Log No. SAC-04-0946), in which plaintiff alleged that he'd been a victim of sexual assault by Brockett, alleged that his transfer to SVSP was retaliatory, and alleged that defendants Vance and Kennedy, through inmate Hackett, had threatened to retaliate against plaintiff for his participation in the Brockett investigation.  Administrative review was bypassed at the informal and first formal levels, and the grievance was forwarded to the OIA-Northern Region for a Second Level Response; Williams provided that response.  (Dkt. No. 35-1 at 23-24.)  Williams explained (id.):

---

[21]  Defendant Williams further avers (Dkt. No. 165-6 at 2-3):

> I served as the Acting Special Agent in Charge (a management/ supervisory position) in the Office of Internal Affairs-Northern Region from May 24, 2004 to January 2, 2005 and from June 6, 2006 to August 31, 2006.  From January 3, 2005 to June 5, 2006 and from September 1, 2006 to November 26, 2006, I served as a Senior Special Agent at the Office of Internal Affairs-Northern Region.  From November 27, 2006 to February 8, 2007, I was Acting Special Agent in Charge (a management/supervisory position) of the central intake unit at the Office of Internal Affairs Headquarters division.  From February 9, 2007 to August 31, 2008, I returned to the Office of Internal  Affairs-Northern Region as a Senior Special Agent until I retired in August 2008.

> As part of the inmate appeals process, I responded to inmate
> Stewart Manago's CDC 602 appeal, Log #SAC-A-04-00946, on
> June 21, 2004.  In my response to inmate Manago, I indicated that
> his CDC 602 appeal (requesting (1) CO Brockett be ordered to take
> a blood test for any type of sexual diseases, including HIV and
> AIDS, and (2) that he (Manago) be provided with a copy of all
> investigative reports regarding the investigation) was denied, as all
> internal affairs investigations were confidential in nature and
> Brockett no longer worked for the Department of Corrections.
> This was the extent of my involvement in Manago's appeal, and I
> did not personally participate in the investigation of claims
> regarding [Manago] or his claims that staff were retaliating against
> him for reporting Brockett.

In addition, defendant Williams noted that plaintiff had been a "voluntary participant" in the Brockett investigation, while plaintiff's allegations of retaliation were "currently under review." (Dkt. No. 35-1 at 26.)  The appeal was denied at the Director's Level on October 12, 2004, on the ground that "the primary complaint against CO Brockett has been resolved and closed," while the "secondary allegation of threats of reprisal has been actively pursued and the investigation remains open."  (Id. at 22.)  The response further provided that, "[u]pon completion of final review, or culmination of an investigation, the appellant will be notified by the investigative body that an inquiry was completed and whether the complaint was unsubstantiated or substantiated. "  (Id.)  On October 11, 2005, Williams issued a follow-up response which reportedly stated that the IAU's review of Hackett's central file found no collaborative evidence to substantiate Hackett's allegations.[22]  (See Dkt. No. 193-4 at 22, and Dkt. No. 165-8 at 14.)  Williams' conclusions were reinforced by the October 12, 2005 and October 28, 2005 memoranda prepared by defendant Sergeant B. Joseph, at the request of CSP-SAC Warden Kernan, which concluded that there was no evidence of retaliation against plaintiff. (Dkt. No. 165-8 at 7-8, 13-4.)

The court finds that Williams' limited role in this action fails to support plaintiff's Eighth Amendment claims against him.  There is no evidence to support a reasonable inference

---

[22] Hackett's allegations involving this matter are addressed in greater detail below.

1   that Williams was involved in the Brockett investigation, or in plaintiff's transfer to SVSP.

2   While the undersigned remains troubled by the characterization of plaintiff's participation in the

3   Brockett investigation as "voluntary," Williams' reliance on this term does not alter his limited

4   role in the relevant matters.  Moreover, at his deposition, plaintiff conceded that his claims

5   against Williams were premised on plaintiff's retaliation claims, that plaintiff "didn't work with

6   him personally," but contested only Williams "response to my staff complaint."  (Pltf. Depo. at

7   83, 86, 88.)

8          For these reasons, the undersigned recommends that summary judgment be

9   granted for defendant Williams on plaintiff's Eighth Amendment claims.

10          D.  Eighth Amendment Claims Against Defendants Vance and Kennedy

11          Plaintiff's remaining Eighth Amendment claims are against correctional staff

12   defendants S. Vance, CSP-SAC/EOP Facility A Correctional Captain, and P. Kennedy, CSP-

13   SAC/EOP Correctional Counselor.  Plaintiff alleges that both defendants were deliberately

14   indifferent to plaintiff's serious mental health needs when they supported the December 23, 2003

15   decision to transfer plaintiff to SVSP.  Plaintiff also alleges that Vance was deliberately

16   indifferent when, on December 10, 2003, he declined to follow the alleged decision of mental

17   health staff to place plaintiff in the Outpatient Housing Unit ("OHU"), and instead ordered

18   plaintiff's cell extraction and placement in AdSeg.

19          1.  December 10, 2003 Cell Extraction

20          As recounted in the summary of facts herein, in a staff complaint plaintiff filed on

21   December 14, 2003 (Log No. SAC-03-2823), plaintiff alleged that, on December 10, 2003,

22   despite the approval of Kennedy and Dr. Frishman that plaintiff be moved to the OHU due to his

23   threats of suicide, Vance used unlawful influence on other employees to deny plaintiff's request

24   for suicide intervention, extract plaintiff from his cell with pepper spray, and place plaintiff in

25   AdSeg.  Plaintiff requested that an investigation be conducted.  (Dkt. No. 35-1 at 15-7; see also

26   Pltf. Depo. at 64-5.)  On December 18, 2003, CSP-SAC Warden Knowles partially granted

plaintiff's complaint at the Second Level, based on the referral of plaintiff's complaint against Vance for investigation. (Dkt. No. 35-1 at 16, 18, 20.)  On February 3, 2004, plaintiff was notified by Knowles that the challenged "incident was evaluated by the Executive Review Committee which determined it did not warrant further review."  (Id. at 18.)  Nevertheless, the Director's Level Response, issued April 8, 2004, denied plaintiff's appeal but noted that plaintiff's allegations of staff misconduct were still "being reviewed and evaluated by the institution's review committee."  (Id. at 14.)

Vance does not address plaintiff's December 10, 2003 cell extraction in his declaration.  (See generally Dkt. No. 165-4 at 2-5.)  However, in his answers to plaintiff's interrogatories, Vance asserts that plaintiff was extracted from his cell and placed in AdSeg because he "was a threat to the safety and security of the institution."[23]  Vance's account is supported by evidence submitted by plaintiff, specifically a December 10, 2003 Rules Violation Report (Form CDC 115), which was issued pursuant to the report of correctional officer Moriarty that plaintiff had challenged her authority by calling her names in front of other inmates, challenged Moriarty's confiscation of plaintiff's raincoat several months before, and refused to be placed in handcuffs by Moriarty.  (See Dkt. No. 194-6 at 31-7.)  The RVR and related Interdisciplinary Progress Notes prepared by psychologist Dr. Gaerlan (plaintiff's case manager), and Dr. Frishman, indicate that several staff members, including Gaerlan, Frishman, Kennedy and Vance, attempted to persuade plaintiff to cooperate with his placement in AdSeg, based on

---

[23]  In his answers to interrogatories, Vance stated (Dkt. No. 194-4 at 28):

I recall that plaintiff Manago was placed in administrative segregation; my review of plaintiff's records indicates that plaintiff was found guilty of a Rules Violation for conduct that could lead to violence regarding an incident on the A Facility yard involving Officer Moriarty.  Later the same day, on December 20, 2003, Plaintiff was served with the administrative segregation placement notice by Lt. Ventimiglia and plaintiff refused to comply with orders to return a pen, paper and clipboard resulting in a delay of 2 ½ hour[s] and requiring cell extraction; as a result, plaintiff was written up for delaying a peace office resulting in a holding cell extraction.  Therefore, plaintiff was a threat to safety and security of the institution and was placed in administrative segregation.

the RVR, without resorting to a cell extraction.  (Id. at 35, 37; see also Dkt. No. 167-3 at 6-11.)

This evidence fails to sustain plaintiff's claim that Vance's participation in plaintiff's December 10, 2003 cell extraction and AdSeg placement demonstrated deliberate indifference to plaintiff's serious mental health needs.  Staff, including mental health staff, engaged in prolonged efforts to persuade plaintiff to cooperate with his AdSeg placement, prior to implementing his cell extraction.  Moreover, plaintiff was provided mental health services shortly thereafter -- on December 14, 2003, plaintiff was transferred from CSP-SAC's EOP unit (AdSeg), to its Correctional Treatment Center ("CTC"), for suicide precautions (Dkt. No. 166-1 at 3), and thereafter, on December 18, 2003, discharged from CTC, and readmitted to the EOP unit (Dkt. No. 166 at 15.)  Taken together, these events fail to make a prima facie showing that Vance was deliberately indifferent to conditions posing a substantial risk of harm to plaintiff when he authorized plaintiff's December 10, 2003 cell extraction and AdSeg placement.  Farmer, 511 U.S. at 834.  Rather, the pertinent facts support the reasonable inference that Vance's challenged conduct was reasonable in light of all the circumstances.  Farmer, 511 U.S. at 844-45.

For these reasons, the undersigned recommends summary judgment for Vance on plaintiff's Eighth Amendment claim premised on plaintiff's December 10, 2003 cell extraction and placement in AdSeg.

## 2. December 23, 2003 Transfer Decision

Plaintiff challenges the December 23, 2003 decision, authorizing his January 21, 2004 transfer to SVSP, on both deliberate indifference and retaliation grounds.  The former is addressed herein.  The initial decision to transfer plaintiff from CSP-SAC to SVSP was made at a Unit Classification Committee ("UCC") meeting.  (Exh. 2 to Kennedy Decl., Dkt. No. 165-5 at 6.)  The December 23, 2003 decision (Form CDC 128G), which notes plaintiff's refusal to appear before the committee, provides in pertinent part (id.):

> UCC notes RVR dated 12/10/03[,] Confidential Memorandum
> dated 12/18/03[,] and CDC 128-B dated 12/18/03 which indicates
> [Manago's] Obsessive and Harassing behavior towards a particular

1   Staff Member that is currently assigned to the EOP Unit.
    [Manago's] fixation on this Staff member has created a hostile
2   work environment and UCC notes transfer to alternate Level IV
    institution is appropriate.  Also note is CDC 128B dated 12/23/03
3   authored by A. Gaerlan, [Manago's] Case Manager which indicates
    [Manago's] claims that due to prior investigations with three
4   Officers currently working EOP 3 Block [none are defendants
    herein] he feels that there is a conflict with him being housed in A
5   FAC EOP 3 Block.

6   . . . Committee acts to refer [Manago] to the CSR RX TX SVSP-IV
    EOP /2nd choice CMC [California Men's Colony]-E-III EOP.
7   UCC notes [plaintiff] is a Level-IV however based upon no other
    alternative level-IV EOP institutions, due to enemy situation, UCC
8   elects to refer for an override to a Level-III EOP. . . . This is a non-
    adverse transfer.

9

10          The UCC decision is signed by defendant Vance, as Chairperson, with the

11  concurrence of defendant Kennedy, CCI and committee recorder, and Dr. Gaerlan, plaintiff's

12  case manager.  (Exh. 2 to Kennedy Decl., Dkt. No. 165-5 at 6; see also Dkt. No. 167-2 at 1.)  Dr.

13  Gaerlan's Interdisciplinary Progress Notes for December 23, 2003, are consistent with the

14  decision in noting that plaintiff had conflicts with three correctional officers in A3 Block (none

15  are defendants herein), and had recently received two RVRs for conflict with staff.  (Dkt. No.

16  167-2 at 1, 3.)  In addition, Kennedy avers that there was discussion at the meeting that plaintiff

17  was "fixated on a correctional officer which created a hostile work environment for that staff

18  member; I recall that the staff member was Officer Moriarty."  (Kennedy Decl., Dkt. No. 165-5

19  at 3.)  It was decided that Kennedy would refer plaintiff for transfer to another institution

20  provided there was no change in plaintiff's EOP LOC.  (Dkt. No. 167-2 at 1.)  Significantly, Dr.

21  Gaerlin's notes indicate that this decision was endorsed by psychiatrist Dr. Frishman, who opined

22  that "[i]t is in client's best interest to be transferred," and by Senior Psychologist Dr. Vasquez,

23  who "agreed the plan was clinically indicated."  (Id.)

24          The UCC decision was endorsed at a January 14, 2004 Interdisciplinary Treatment

25  Team ("IDTT") meeting.  (Dkt. No. 166-5 at 7-9.)  Plaintiff attended the meeting, as did

26  defendants Vance and Kennedy, as well as Drs. Gaerlan, Vasquez, Frishman, and Perry, and

other team members.  (Id. at 7.)  Plaintiff questioned why he needed to be retained in an EOP

program; expressed his preference to be transferred to a "mainline CCCMS" program, either at

CSP-SAC or CSP-LAN; and stated that "SVSP is not okay because he claims he has a relative

working there."  (Id. at 9.)  Nevertheless, plaintiff was transferred to SVSP's EOP unit on

January 21, 2003.

Because the decision to transfer plaintiff was unanimously supported by plaintiff's

mental health providers, the involvement of Vance and Kennedy in this decision appears to be

both reasonable and proactive.  Farmer, 511 U.S. at 844-45.  However, additional evidence of

record, submitted by defendants, indicates that "**[d]etermining factors in deciding inmate**

**Manago's transfer** from SAC IV to SVSP IV on 1/21/04 [the IDTT meeting] was based on

Confidential Information dated 12/18/03 and a CDC 128-B dated 12/18/03, **Manago's**

**participation with the Internal Affairs Investigation into staff misconduct** as well as

consideration of Classification Issues, Medical needs (EOP), and prison availability."  (Dkt. No.

165-8 at 12; see also id. at 6) (emphasis added.)  This information is contained in the October

2005 memoranda prepared by Correctional Sergeant B. Joseph, the Criminal Prosecution

Coordinator in CSP-SAC's Investigative Services Unit ("ISU"), at the request of CSP-SAC

Warden Kernan, who sought an ISU investigation into plaintiff's claims that he had been

subjected to retaliatory transfers, false RVRs and unsupported AdSeg placements, threats to his

life, and a conspiracy of correctional staff to remove plaintiff from SVSP and HDSP yards based

on false confidential information.  (Id. at 5-17.)  Joseph found no support for the remainder of

plaintiff's claims.

This evidence demonstrating that the decision to transfer plaintiff to SVSP was

based, at least in part, on plaintiff's participation in the Brockett investigation, is underscored by

the fact that Brockett remained working at CSP-SAC until her termination on March 31, 2004.

Moving plaintiff out of CSP-SAC only four days after his January 17, 2004 recording of his

interactions with Brockett allowed officials to continue the investigation without any potential

disclosure or interference by plaintiff.  Moreover, the December 23, 2003 UCC decision was

reached only five days after plaintiff was discharged from the CTC, where he was on suicide

watch; six days after plaintiff first met with Chapman; and three days after plaintiff's allegedly

first intimate contact with Brockett.  The January 14, 2004 IDTT decision was reached only five

days after Chapman presented the "operation plan" to plaintiff; four days after plaintiff gave

Brockett the putative letter to mail; and two days before plaintiff was supplied with the subject

voice recorder.

        The declaration of Vance, who was Facility A Correctional Captain at all relevant

times, supports a reasonable inference that he was aware of plaintiff's participation in the

Brockett investigation as it transpired, and was uniquely positioned to facilitate both plaintiff's

participation in the investigation and plaintiff's transfer.  Vance avers in pertinent part (Vance

Decl., Dkt. No. 165-4 at 3):

> I first came into contact with inmate Stewart Manago when I
> transferred to A Facility at CSP-SAC as the Facility Captain.  [¶]
> When I was first transferred to A Facility where inmate Manago
> was housed, I recall the outgoing Facility Captain, Captain J.
> Walker, briefly telling me that an investigation had been going on
> involving Manago and an officer in the dining room and he
> informed me that the investigation was winding down.  I did not
> know any more information about this investigation, was not
> involved in the investigation and never read any reports about the
> investigation.  I did not learn until later that the officer involved
> was Officer Brockett.

Although Vance does not provide the date of his transfer to A Facility,[24] the record supports an

inference that it was sometime before December 10, 2003, when Vance ordered plaintiff's cell

extraction.  The relevant events between plaintiff and Brockett took place shortly thereafter.

        This evidence, together with Vance's role in making custodial decisions in

consultation with Dr. Gaerlan (see e.g. Dkt. Nos. 167-2 at 1; 167-3 at 9; 166-5 at 7-9) (who was,

---

[24]  Similarly, Vance does not provide the date when he learned that the subject
investigation was about defendant Brockett.  However, in his responses to plaintiff's
interrogatories, Vance conceded that he learned about Brockett's alleged misconduct and related
investigations "in the early 2000s."  (Dkt. No. 194-4 at 29.)

in turn, expressly aware of plaintiff's interactions with the OIA (see n.20, supra)), supports an

inference that Vance was not only contemporaneously aware of plaintiff's participation in the

Brockett investigation but, as Facility Captain, authorized and facilitated such participation, e.g.,

by allowing plaintiff to meet with OIA officials, enter the dining room unescorted, and wear a

recording device.  No other correctional defendant apparently had such access to, and influence

regarding, both plaintiff's custodial and mental health care status.  Vance has presented no

evidence to rebut these reasonable inferences.

While the available evidence supports a reasonable inference that Vance had a

greater awareness of these matters than did Kennedy,[25] the fact that the challenged UCC decision

was made only by Vance, Kennedy and Gaerlan, supports a reasonable inference that Kennedy

was aware of all pertinent factors supporting that decision.  Moreover, while Sergeant Joseph's

memoranda states that the Brockett investigation was a factor in the IDTT's transfer decision (not

the UCC decision), that meeting was also attended by Vance, Kennedy and Gaerlan.

For these reasons, the undersigned finds that this action should proceed on

plaintiff's Eighth Amendment claims that Vance and Kennedy failed to protect plaintiff, pursuant

both to plaintiff's active participation in the Brockett investigation, and plaintiff's transfer to

SVSP.

E. No Qualified Immunity on Plaintiff's Cognizable Eighth Amendment Claims

For the foregoing reasons, and as summarized at the conclusion of these findings

and recommendations, the court finds that this action should proceed on plaintiff's narrowed

Eighth Amendment claims against defendants Chapman, Kelly, Jaffe, Martin, Vance and

Kennedy, as well as Brockett.  None of these defendants are entitled to qualified immunity on

---

[25]  Kennedy avers that she "was not involved in the investigation of Officer Mary Brockett's alleged misconduct involving Plaintiff Manago . . . [and] only heard that there had been an investigation of Brockett after the fact. . . . At the time of the UCC meeting on 12/23/03, I had no knowledge of the Brockett investigation involving Manago . . . ."  (Kennedy Decl., Dkt. No. 165-5 at 3.)

1    these claims.  Construing the relevant facts in the light most favorable to plaintiff, no defendant

2    can reasonably assert that plaintiff did not, at all relevant times, have a clearly established right to

3    constitutionally adequate mental health care which, allegedly, defendants knowingly violated

4    pursuant to their challenged conduct.  Anderson, supra, 483 U.S. at 640; Farmer, 511 U.S. at 834.

5        F.  First Amendment Retaliation Claims

6            Pursuant to ruling on defendants' motions to dismiss, the court found that

7    plaintiff's First Amended Complaint states cognizable First Amendment retaliation claims

8    against defendants Vance, Kennedy, Williams, Chapman, Shannon, Joseph, Garcia, Tinseth,

9    Wachter, Morrow, Hill and Gold.  The court also found that plaintiff states related supervisory

10   liability claims against defendants Vance, Williams, Chapman, Kelly, Jaffe, Shannon, Joseph,

11   Hill and Gold.  (Dkt. No. 78 at 24.)

12           Defendants move for summary judgment on each of these claims.  For the reasons

13   that follow, the undersigned recommends summary judgment for defendants on each of

14   plaintiff's First Amendment retaliation claims.

15       1.  Legal Standards

16           "[A] viable claim of First Amendment retaliation entails five basic elements:  (1)

17   An assertion that a state actor took some adverse action against an inmate (2) because of (3) that

18   prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First

19   Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."

20   Rhodes v. Robinson, 408 F.3d 559, 568 (9th Cir. 2005).  Moreover, direct and tangible harm will

21   support a First Amendment retaliation claim even without demonstration of chilling effect on the

22   further exercise of a prisoner's First Amendment rights.  Id. at 568, n.11.  "[A] plaintiff who fails

23   to allege a chilling effect may still state a claim if he alleges he suffered some other harm" as a

24   retaliatory adverse action.  Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009), citing

25   Rhodes, 408 F.3d at 568, n.11.

26   ////

1    Subject to these standards, the court is nevertheless required to "avoid excessive

2  federal judicial involvement in prison administration," and to "'afford appropriate deference and

3  flexibility to state officials trying to manage a volatile environment.'" Pratt v. Rowland, 65 F. 3d

4  802, 807 (9th Cir. 1995), quoting Sandin v. Connor, 515 U.S. 472, 482 (1995).

5    2.  Analysis

6      a.  Claim of Allegedly Retaliatory Transfer of Plaintiff Against

7        Defendants Chapman, Williams, Vance, Kennedy and Hill

8    Plaintiff alleges that his transfer to SVSP's EOP program, on January 21, 2004,

9  was an act of retaliation by defendants Chapman, Williams, Vance, Kennedy and Hill, due to

10  plaintiff's participation in the Brockett investigation.  Plaintiff testified that no one explained the

11  reason for his transfer, which was made over his objections.  (SAC, Dkt. No. 20 at 7, 9-10; Pltf.

12  Depo. at 56, 106-7.)

13    While plaintiff's challenge to his 2004 transfer supports a deliberate indifference

14  claim, it fails to satisfy one element necessary to sustain a retaliation claim.  Because all involved

15  mental health professionals found plaintiff's transfer to be in his best interests, from a mental

16  health treatment perspective, plaintiff cannot demonstrate that his transfer "did not reasonably

17  advance a legitimate correctional goal." Rhodes, supra, 408 F.3d at 568.  Thus, plaintiff fails to

18  demonstrate a cognizable retaliation claim against defendants Vance and Kennedy on this basis,

19  despite their direct involvement in the challenged transfer.

20    Additional reasons support summary judgment for defendants Chapman,

21  Williams, and Hill (CSP-SAC Associate Warden from 2006 to January 2009), on this claim.

22  There is no evidence of record to support a finding that defendant Williams had any role in the

23  December 23, 2003 transfer decision.  Williams' participation in this action commenced with his

24  May 24, 2004 assignment to the OIA-Northern Region.  Plaintiff conceded this fact in his

25  deposition, stating that Williams was not "initially" involved in the Brockett investigation, but

26  became involved when he investigated plaintiff's inmate appeal (Log No. 04-0946), which

1   plaintiff filed in May 2004, and to which Williams responded in June 2004.  Similarly, there is

2   no evidence of record to support defendant Hill's participation in the subject transfer.  Hill's

3   involvement with this action commenced in October 2006, pursuant to his participation in

4   reviewing plaintiff's administrative grievances.  Finally, the only evidence that Chapman had any

5   involvement in plaintiff's transfers is her concession that she sought, unsuccessfully, to have

6   plaintiff transferred from SVSP to CMF.  (Dkt. No. 165-2 at 3.)

7              For these reasons, summary judgment should be granted for defendants Chapman,

8   Williams, Vance, Kennedy and Hill, on plaintiff's claim that these defendants violated his First

9   Amendment rights by transferring him to SVSP in retaliation for plaintiff's participation in the

10  Brockett investigation.

11              b.  Alleged Threat of Harm by Defendants Vance and Kennedy

12              While housed at SVSP, plaintiff filed an administrative grievance on May 11,

13  2004 (Log No. SAC 04-0946), alleging sexual misconduct by Brockett, as well as alleged

14  retaliation against plaintiff by correctional staff for plaintiff's participation in the Brockett

15  investigation.  In support of the latter claim, plaintiff attached two notes allegedly written by

16  SVSP inmate Brian Hackett.  (Dkt. No. 35-1 at 27.)  The first attachment is a handwritten note,

17  addressed to "Eight-Ball" (plaintiff's nickname), and allegedly signed by Hackett, which states

18  that, on February 9, 2004, when Hackett was at CSP-SAC's "CTC" [Correctional Treatment

19  Center] ("because I fell down the stairs and was on suicide watch"), "Vance and Ms. P. Kennedy

20  . . . came to me and . . . said if I delivered this message to you that they'd make sure I received

21  my proper medical treatment, man I was in bad shape and still is but I said I'd deliver the

22  message because I was in severe pain and under duress.  I wasn't even suppose to come to this

23  prison [SVSP] I was put up for Lancaster and CSP Corcoran due to my medical situation I even

24  got the ADA complaint to show you."  (Id. at 29.)  Hackett passed along the following message:

25              They said they would make sure I was placed where you were at
             Salinas Valley and to tell you that if you get at that bitch from the
26           kitchen again or try to make further problems for her by testifying

1  against her, it's gonna be all bad for you folks, They gonna send
   somebody to kill you or you kill them either way you'd never see
2  day light or the streets again.  So whatever it is you got going on
   folks, you need to drop it or watch your back!  That's the message,
3  I was sent here to specifically deliver you this message so take it
   for what its worth, on a heads up!
4

5  (Id.)  These allegations are repeated in Hackett's formal declaration, dated May 7, 2004, also

6  attached to plaintiff's subject grievance.[26]  (Id. at 30-31.)

7          At his deposition, plaintiff read aloud Hackett's handwritten note, and observed

8  that, upon Hackett's transfer to SVSP, he was placed only "two doors down" from plaintiff,

9  allegedly for the purpose of providing plaintiff with the alleged message from Vance and

10 Kennedy  (Pltf. Depo. at 88; see generally id. at 88-96.)  Moreover, plaintiff testified, although

11 Vance and Kennedy had originally put Hackett up for transfer to Lancaster or Corcoran, they

12 instead transferred him to SVSP, in order to give plaintiff their subject message.

13         Plaintiff testified that further evidence in support of this claim is the fact that

14 plaintiff was subject to a cell extraction at SVSP, on allegedly false charges, two weeks after his

15 June 2, 2004 testimony in the Brockett matter.   Plaintiff testified that, on June 16 or 17, 2004,

16 staff came to plaintiff's cell and told him to "cuff up" because he was going to AdSeg for

17 conspiracy to assault staff.  When plaintiff declined to cooperate, his cell was pepper sprayed,

18

19     [26] Hackett's undated handwritten note and May 7, 2004 declaration, as well as a
   subsequent declaration dated May 22, 2004, are also included in plaintiff's exhibits.  (See Dkt.
20 Nos. 193-1 at 2-4; 193-4 at 23-24; 193-5 at 2.)  Defendants object to the court's reliance on these
   documents on grounds of foundation, authentication and hearsay.  (See Dkt. No. 222 at 3.)
21 Defendants' objections are overruled for purposes of summary judgment; this court offers no
   opinion on the admissibility of these documents at trial.  This court does not accept as true the
22 allegations contained in Hackett's note and declaration, only the apparent fact that these
   documents were written by Hackett and communicated to plaintiff.  These documents were
23 deemed sufficiently reliable by prison officials to evoke formal responses to plaintiff's related
   administrative grievance, as well as a further investigation by the IAU, at the CSP-SAC
24 Warden's request, and as conducted by defendant Joseph.  Moreover, the docket indicates that
   inmate Hackett is now deceased  (see Dkt. No. 210), which may support an unavailability
25 exception to the hearsay rule, see Fed. R. Evid. 804(a)(4), (b)(3).  Consideration of these
   documents is also warranted by the undersigned's task to review the record on summary
26 judgment in the light most favorable to plaintiff.  Matsushita, 475 U.S. at 587; Saucier v. Katz,
   533 U.S. 194, 201 (2001).

and plaintiff moved to AdSeg.  Plaintiff avers that he was cleared of all charges on August 9, 2004.  (On August 19, 2004, plaintiff was moved from AdSeg to B Facility, where he remained until his transfer to HDSP on September 14, 2004.)  It is plaintiff's contention that this incident represented follow-through on the threats made by Vance and Kennedy, as communicated to plaintiff by inmate Hackett.  (FAC at 10-1; Pltf. Depo. at 109-11.)

Plaintiff's exhibits include a Director's Level Review decision and related filings in response to defendant Hackett's November 24, 2003 ADA request (on a Form CDC 1824), for transfer from CSP-SAC to another institution better equipped to accommodate Hackett's mobility impairments.  (See Dkt. No. 194-7 at 64-8.)[27]  Kennedy reviewed Hackett's request, and wrote that Hackett "was seen on 12/23/03 by UCC and referred to CSRT for transfer to COR [CSP-Corcoran] IV EOP, LAC [CSP-Los Angeles, in Lancaster]."  (Id. at 66.)  The recommended transfer was approved by CSP-SAC Warden Stiles on January 5, 2003.  (Id.)  However, pursuant to the Second Level Review of Hackett's request, Associate Warden Knowles informed Hackett that he had instead been "endorsed to Salinas Valley State Prison Level IV, a non-impacting designated institution whose physical structure will better accommodate your physical needs and aids."  (Id. at 68.)  The Director's Level Review, issued March 19, 2004, by Appeals Chief Grannis, affirmed the Second Level decision, noting that Hackett was transferred to SVSP on February 24, 2004.  (Id. at 66.)

In addition to Hackett's notes and affidavits, plaintiff has submitted the affidavits of inmates Robinson, Ware, Scruggs, Sanders, Taylor, Bibbs, Blevens and Chappell, in support of the instant retaliation claims against Vance and Kennedy.  (Pltf. Depo. at 95-6; Affidavits are

---

[27]  Defendants' objections to this court's review of these documents (Dkt. No. 222 at 17-18), are overruled.  In addition to the reasons stated in the prior footnote, there is no apparent reason for questioning, on summary judgment, the authenticity of these formal administrative documents.  Documents not authenticated at summary judgment may nonetheless be admissible at trial.  See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003) (evidence which could be made admissible at trial may be considered on summary judgment); see also Aholelei v. Hawaii Dept. of Public Safety, 220 Fed. Appx. 670 (9th Cir. 2007).

at Dkt. No. 193-5 at 3-16.)  Defendants' objections to these affidavits on grounds of foundation, authentication, hearsay and relevance (Dkt. No. 222 at 7-11, 15, 19-21), are duly noted and sustained.

The undersigned has carefully reviewed plaintiff's admissible evidence in support of his retaliation/threat of harm claim against defendants Vance and Kennedy.  However, like plaintiff's previous retaliation claim, the instant claim fails to contain all of the necessary elements.  Lacking in the present claim is evidence that defendants' alleged threat "chilled [plaintiff's] exercise of his First Amendment rights."  Rhodes, 408 F.3d at 568.  On the contrary, plaintiff defied defendants' alleged threat by testifying in the Brockett matter, and has presented no evidence to demonstrate that he was an unwilling or uncooperative witness.  Plaintiff alleges an alternative harm, see id. at 568, n.11; Brodheim, 584 F.3d at 1269, specifically, his cell extraction executed two weeks after his testimony before the State Personnel Board, on charges that were later dismissed.  However, plaintiff has submitted no evidence demonstrating a connection between the alleged threat made by defendants Vance and Kennedy, and plaintiff's SVSP cell extraction.  This omission is underscored by plaintiff's only pertinent (and apparently immaterial) deposition testimony, viz., that "Lieutenant C. Donahue, the one that ordered me locked up, is a known convicted felon.  Okay.  He got several convictions -- got four aka names while working as s corrections officer.  He was the one who solicited these inmates to fabricate the charges on [me]."  (Pltf. Depo. at 110-11.)

For these reasons, the court finds plaintiff has failed to demonstrate a cognizable retaliation claim against defendants Vance and Kennedy based on their alleged threat delivered by inmate Hackett.  Summary judgment should be granted for defendants Vance and Kennedy on plaintiff's claim that these defendants threatened physical harm to plaintiff if he testified in the Brockett matter.

c. Alleged Retaliatory Misconduct After April 6, 2005 Against
Defendants Vance, Shannon, Joseph, Garcia, Tinseth, Wachter,

1                                  <u>Morrow, Hill and Gold</u>

2          Following his incarceration at SVSP, plaintiff was incarcerated at HDSP from

3 September 14, 2004, until April 6, 2005, then transferred back to CSP-SAC.  Plaintiff alleges

4 that, upon his return to CSP-SAC, he was subjected to retaliatory misconduct by prison officials

5 due to plaintiff's participation in the Brockett investigation.  Pursuant to his administrative

6 grievance filed October 15, 2006, plaintiff alleged that defendants Vance, Shannon, Joseph,

7 Garcia, Tinseth, Wachter, and Morrow spread rumors that plaintiff was a "snitch" for

8 participating in the Brockett investigation, and announced that it was "open season" against

9 plaintiff, thus "conspiring or inciting other inmates to assault appellant, . . . working hand to hand

10 in order to have additional false confidential information placed in appellant's C-file, . . .

11 granting special privileges to some inmates who assist them with their retaliatory actions [against

12 plaintiff] . . . paying some inmates tobacco and coffee in order to have some well known

13 mentally ill inmate patients to file false confidential information against me as a flavor (sic) for

14 Captain S. Vance and other corrupted staff on 'A' Facility."  (Log No. SAC 06-0783.)  (Dkt. No.

15 35-3 at 4-6.)  Plaintiff requested that an unbiased investigation be conducted by the OIA.  (<u>Id</u>. at

16 4.)  These allegations are reiterated in plaintiff's amended complaint.  (FAC, Dkt. No. 20 at

17 12-18.)

18          Associate Warden Hill issued the First Level Response on November 15, 2006,

19 noting that plaintiff had been interviewed on October 31, 2006, by Sergeant Gold, and that

20 plaintiff's grievance was therefore partially granted insofar as "an inquiry into your allegation has

21 been conducted." (Dkt. 35-3, at 8.)   Plaintiff thereafter complained that Sergeant Gold failed to

22 ask him for the inmate witness evidence he offered.  (<u>Id</u>. at 5.)  Warden J. Walker issued the

23 Second Level Response on December 26, 2006, stating that the inquiry into plaintiff's allegations

24 had been completed and no further inquiry was warranted.  (<u>Id</u>. at 9.)  In response to plaintiff's

25 statement of dissatisfaction that staff failed to interview his witnesses (<u>id</u>. at 5), the Director's

26 Level Appeal Decision, issued April 12, 2007, granted in part plaintiff's appeal, stating (<u>id</u>. at 2):

1    On April 10, 2007, the written report of appeal inquiry of the staff
     complaint was obtained and examined at the DLR.  The inquiry does
2    nothing to investigate the appellant's allegations.  For example, the
     investigator states that he does not have to interview witnesses, if the
3    appellant does not provide the names before the interview.  The DLR
     maintains that this statement is inaccurate and not consistent with effective
4    misconduct investigative standards.  Based on the above, the
     institution shall redo the inquiry addressing any and all facts that support their
5    eventual finding.  The appellant shall be notified of its completion. . . .
     This decision exhausts the administrative remedy available to the appellant
6    within the CDCR.

7    Pursuant to ruling on defendants' motions to dismiss, this court found that this

8    administrative appeal demonstrated exhaustion of plaintiff's retaliation claim against defendants

9    Vance, Shannon, Joseph, Garcia, Tinseth, Wachter, and Morrow.  In addition, the court found

10   that plaintiff's retaliation claims against defendants Hill and Gold were exhausted by this appeal,

11   because the Director's Level Review found the actions of Hill and Gold inconsistent with

12   effective misconduct investigative standards.  Inclusion of all of these defendants was also found

13   to be consistent with plaintiff's claim that a "code of silence" ("Green Wall") surrounded the

14   alleged retaliatory misconduct of these defendants.  The court further found that plaintiff had

15   stated cognizable retaliation claims against defendants Vance, Shannon, Joseph, Hill and Gold, in

16   their respective supervisory roles.[28]

17   In support of these claims, plaintiff has submitted the affidavits and completed

18   questionnaires[29] of several CSP-SAC inmates, dated 2005 to 2009.[30]  Defendants' objections to

19

20   [28]  The amended complaint identifies these defendants' supervisory roles as follows:
     Hill is the Associate Warden at CSP-Sacramento, Vance is Facility Captain, Shannon is
21   Correctional Lieutenant, and Joseph and Gold are both Correctional Sergeants.  (Dkt. No. 20, at
     3.)

22   [29]  In pertinent part, the questionnaire prepared by plaintiff sought to ascertain whether the
23   reporting inmates had witnessed CSP-SAC correctional officers "manipulating mentally ill
     inmates to get themselves involved in violence," or "to engage into any type of serious
24   misconduct;" whether the inmates had been denied proper mental health care; whether "any
     mental health staff . . . ever committed fraud and Falsification of your mental health records, in
25   order to cover up staff misconduct;" whether the inmates had witnessed any correctional officers
     "attempt to intimidate inmates, who report . . . staff criminal misconduct;" whether inmates had
26   information concerning any CSP-SAC correctional staff "setting up some inmates to be assaulted
     and murdered, as a form of retaliation and retribution for reporting staff criminal behavior," or

1  this evidence (see Dkt. No. 22 at 7-11), on grounds of authentication, foundation, hearsay and

2  relevance, are sustained.  The court finds that, even if these questionnaires could be properly

3  authenticated, they are of very limited relevance to plaintiff's own retaliation claims.  Moreover,

4  the wide-ranging and anecdotal averments of plaintiff's witnesses are rebutted by the declarations

5  of each defendant that none has ever "at any time attempted to cause harm or incite or direct

6  others to cause harm" to plaintiff; at no time referred to plaintiff as a "snitch"; never told anyone

7  that it was "open season" against plaintiff; and never associated with a "Green Wall."[31]

8           For these reasons, the undersigned recommends that summary judgment be

9  granted on plaintiff's claims of retaliatory misconduct, allegedly commencing with plaintiff's

10  return to CSP-SAC in April 2005, against defendants Vance, Shannon, Joseph, Garcia, Tinseth,

11  Wachter, Morrow, Hill and Gold.

12  ////

13

14  "having false charges filed against some inmates, who report staff serious criminal behavior;" or
   whether inmates had information about "Mental Health Staff, working in concert to cover up []
15  some Correctional officers wrongdoing;" whether any inmate had experienced prison officials
   doing "an absolutely pathetic and superficial job investigating your complaints" as set forth in an
16  inmate appeal; whether the inmates had heard rumors that plaintiff was a "snitch" for reporting
   staff sexual misconduct, particularly whether any inmate had heard that any of the following
17  correctional staff had spread such rumors about plaintiff, listing defendants herein Vance,
   Shannon, Joseph, Gold, Garcia, Tenseth, Wachter and Morrow, as well as non-defendant Laffitte.
18  (See e.g. Dkt. No. 193-5 at 17-25.)

19     [30]  The questionnaires were completed by inmate A. Robinson on July 28, 2009; inmate
20  K. Avery on June 28, 2009; inmate A. Scruggs on July 3, 2009; inmate R. Lay Jr. on February
   26, 2008;  inmate K. Taylor on July 2, 2009; inmate R. Bibbs on June 26, 2009; inmate K.
21  Candler on November 12, 2008;  inmate D. Bass on November 27, 2009; inmate P. Blevins on
   July 14, 2009; inmate G. Wheaton on July 13, 2009; inmate R. Chappell on October 3, 2009; and
22  inmate B. Fuller on September 29, 2009.  (See Dkt. Nos. 193-5 at 17 through 193-6 at 94.)  The
   pertinent affidavits were completed by inmate A. Robinson, dated September 28, 2005; inmate
23  K. Avery, dated November 28, 2005; two affidavits by inmate A. Scruggs, dated December 11,
   2005 and March 1, 2006; inmate M. Sanders, dated July 29, 2006; and inmate A. Tarkington,
24  dated August 3, 2009.  (See Dkt. No. 193-5 at 3-16.)

25     [31]  See Vance Decl. (Dkt. No. 165-4 at 4); Shannon Decl. (Dkt. No. 165-10 at 3); Joseph
   Decl.  (Dkt. No. 165-8 ay 3-4); Garcia Decl. (Dkt. No. 165-3 at 3); Tinseth Decl. (Dkt. No. 165-
26  12 at 2-3); Wachter Decl. (Dkt. No. 165-13 at 3); Morrow Decl. (Dkt. No. 165-11 at 2-3); Hill
   Decl. (Dkt. No. 165-9 at 3); and Gold Decl. (Dkt. No. 165-7 at 3).

VI.  <u>CONCLUSION</u>

For the foregoing reasons, IT IS HEREBY RECOMMENDED that:

1.  Defendant Brockett's motion for summary judgment (Dkt. No. 183), be denied.

2.  The motion for summary judgment filed by the remaining defendants (Dkt. No. 164), be granted in part and denied in part.

3.  Summary judgment be granted for defendants Williams, Shannon, Joseph, Garcia, Tinseth, Wachter, Morrow, Hill and Gold.

4.  Summary judgment be granted for defendants on each of plaintiff's First Amendment retaliation claims.

5.  Summary judgment be denied, and this action proceed, on the following Eighth Amendment claims:

a.  Plaintiff's claims against defendant Brockett, for alleged sexual misconduct;

b.  Plaintiff's claims against defendants Kelly and Jaffe, based on theories of deliberate indifference to serious mental health needs, failure to protect, and supervisory liability.

c.  Plaintiff's claims against defendant Martin, based on theories of deliberate indifference to serious mental health needs, and failure to protect, but not supervisory liability.

d.  Plaintiff's claims against defendants Chapman, Vance and Kennedy, based on an alleged failure to protect.

These amended findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Amended Findings and Recommendations."  Any response to the objections shall be filed and served within 14 days after service of the objections.  The parties

////

////

1   are advised that failure to file objections within the specified time may waive the right to appeal

2   the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

3   DATED:  March 13, 2013

4

5                            KENDALL J. NEWMAN

6                            UNITED STATES MAGISTRATE JUDGE

7   mana2290.msj.amd

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26